1998 SD 21

**BORDER STATES PAVING, INC., a corporation with its principal place of business at Fargo, North Dakota, Plaintiff and Appellant,**

v.

**The STATE of South Dakota By and Through the SOUTH DAKOTA DEPARTMENT OF TRANSPORTATION, a state agency located at Pierre, South Dakota, Defendant and Appellee.**

No. 19997.

Supreme Court of South Dakota.

Considered on Briefs Jan. 13, 1998.

Decided March 4, 1998.

Ronald G. Schmidt of Schmidt, Schroyer, Moreno & Dupris, Pierre, for plaintiff and appellant.

Barton R. Banks and Samuel D. Kerr of Banks, Johnson, Colbath & Kerr, Rapid City, for defendant and appellee.

GILBERTSON, Justice.

[¶ 1.] Border States Paving Corporation, a North Dakota paving construction company, appeals from the trial court's denial of its motion for judgment notwithstanding the verdict or, in the alternative, its motion for new trial after a jury verdict was returned in favor of the South Dakota Department of Transportation. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] On June 13, 1993, the South Dakota Department of Transportation (DOT) accepted a bid from Border States Paving, Inc. (Border States) on a contract for asphalt resurfacing of a 12–mile portion of Highway 46 in Yankton County, South Dakota. The contract required Border States to mill off a portion of the old asphalt surface, place two layers or "lifts" of asphalt (one leveling course and one wearing course), and complete some painting and guardrail work. The bid and resulting contract specified the project to be completed on or before October 15, 1993, as this was the seasonal deadline established by DOT.

[¶ 3.] Border States was responsible for obtaining the aggregate materials needed for the paving project. Border States subcontracted with Weatherton Contracting (Weatherton), an aggregate crushing business, to provide the materials for the asphalt operation. DOT plans provided for the use of an optional materials pit, maintained by DOT, should Border States run into difficulty with its supply of materials. In the event the optional pit could not meet Border States' needs, Border States was required to find another source. Due to heavy rains in 1993, Weatherton's scale and the access road to the pit were flooded. Near the same time, the optional pit was also partially flooded which prevented Border States from receiving its materials from the optional pit. Weatherton later testified that the pit was not accessible until late August or early September 1993. As a result, Border States argued its completion of the project was delayed. However, DOT engineer Ron Peterson testified that both the scale and the pit were being utilized by Weatherton to haul gravel to another nearby project in which Weatherton was the prime contractor as early as August 11, 1993.

[¶ 4.] Border State's president, Dan Thompson, was present at a preconstruction conference held in Yankton on August 18, 1993. After the conference, Thompson had several conversations with Weatherton concerning the availability of materials for the Highway 46 project. Thompson believed the project could be completed in 19–20 days and meet the seasonal deadline as specified in the contract. Thompson testified that Weatherton subsequently informed him that the Highway 46 materials would not be available until mid-September.[1] Shortly thereafter,

---

1. Near the end of August, Weatherton decided to reallocate 35,000 tons of stockpiled material to Border States for the Highway 46 project. On

Border States elected to transfer its crew and equipment from the Highway 46 project to another project in Hill City, South Dakota. The Hill City project was completed on September 30, 1993.

[¶ 5.] Border States began its Highway 46 operations on October 6, 1993. Previously, on August 23, 1993, Border States requested a time extension from DOT. DOT did not respond. On October 12, 1993, Border States then requested a waiver of the October 15 deadline so they could finish the project before the end of the year and avoid the expense of bringing its crew and equipment back to Yankton the following spring. DOT denied the waiver and felt placement of the first lift would adequately sustain winter travel until Border States could return to complete the second lift. Based on prior experience, DOT did not want the top lift paved in the colder temperatures inherent to South Dakota after October 15. DOT was concerned with surface defects which could result from cold weather paving. The problems previously encountered with cold weather paving were addressed as early as 1990 in the South Dakota Department of Transportation *Standard Specifications for Roads and Bridges* § 320.3A which provided a seasonal limitation of October 15 for asphalt concrete operations.

[¶ 6.] Border States persisted in its request to finish the project before the end of the year. DOT eventually drafted a change order which allowed Border States to finish the project in 1993 and addressed DOT's concerns over surface defects. This change order is the subject of this litigation and stated in part:

> The seasonal limit of October 15 for the Surface Course shall be waived, but the following conditions will apply:
>
> 1. Minimum air start up temperature is 45 degrees F.
>
> 2. Windchill shall not drop below 30 degrees F[.]
>
> 3. All trucks carrying asphalt ... will have the load tarped.
>
> 4. Mix temperature at the plant will be set at 290 degrees F.
>
> 5. Compaction rolling shall be completed before the temperature of the inplace mix drops below 185 degrees F.
>
> 6. *In the Spring of 1994, an inspection of the top of the road will be made to determine if there is any raveling, or any surface defect due to cold weather asphalt concrete work.*
>
>    *If raveling or other surface defects are present, [Border States] will be required to provide a chip seal on that day's run which shows the defects ....*
>
> 7. The flush seal coat will be applied when the air and surface temperature are at least 50 degrees F. in the shade. The November 1 seasonal limit will not apply.
>
> The above will be done at no additional cost to the State.

(Emphasis added).

[¶ 7.] During late October and November 1993, Border States' completion of the second layer was delayed due to temperatures below that required in the change order. The project was finally completed and Highway 46 was opened December 10, 1993. In the spring of 1994, DOT inspected Border State's paving work and observed intermittent surface defects throughout the project. The worst areas were located on the west end of the project which was paved last and when temperatures were coldest. The parties disagreed as to the cause of the defects. Border States agreed that the cold may have been a factor but maintained that the defects also could have been caused by a "mix" design problem.[2] DOT believed the defects

---

September 9, 1993, Weatherton billed Border States for 30,000 tons of the total 37,000 tons that were needed for the project. Weatherton testified that even though the materials were available to Border States, the pit and scale were still inaccessible and it could not import the required "add rock" at that time.

2. The mix design is essentially a customized asphalt "recipe" which takes into account materi-

als that may be procured from rock, sand or gravel stockpiles near the project. The Highway 46 project utilized the commonly used Marshall mix design method. The process entails preparation of several small pavement specimens from different combinations of materials available for the project. The specimen that falls within an established mix design criteria and best meets the needs of the road is then selected.

were caused by the effect of the cold weather on the paving process.

[¶ 8.] Border States brought suit against DOT seeking to recover the $6,600 in liquidated damages that DOT withheld as a result of the delay, the $94,256 Border States had expended in order to complete the work, interest, costs and attorney's fees. A jury trial began on December 2, 1996. The circuit court denied both parties' motions for a directed verdict submitted at the close of Border States' case and again after the close of all the evidence.

[¶ 9.] Border States essentially argued that it did comply with change order conditions 1–5 and therefore, condition 6 was inapplicable. DOT argued that condition 6 was specifically included to allow Border States to finish the project in 1993 while addressing DOT's concerns over raveling or surface defects due to cold weather or late season paving. A verdict in favor of DOT on all issues was returned. Border States made a motion for a judgment notwithstanding the verdict and/or for a new trial. The trial court denied both motions. Border States appeals raising the following issues for our review:

1. Whether the trial court's denial of Border States' motions for directed verdict and judgment NOV was proper?

2. Whether the trial court's denial of Border States' motion for new trial was proper?

## STANDARD OF REVIEW

[¶ 10.] Our standard of review on motions for directed verdict and judgment NOV is well settled:

A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

A motion for judgment [notwithstanding the verdict] is based on and relates back to a directed verdict motion made at the close of all the evidence. [SDCL 15–6–50(b).] Thus, the grounds asserted in support of the directed verdict motion are brought before the trial court for a second review. We review the testimony and evidence in a light most favorable to the verdict or the nonmoving party, then without weighing the evidence we must decide if there is evidence which would have supported or did support a verdict.

*Schuldies v. Millar,* 1996 SD 120, ¶ 8, 555 N.W.2d 90, 95 (quoting *Junge v. Jerzak,* 519 N.W.2d 29, 31 (S.D.1994) (citations omitted)); *see also State v. DeNoyer,* 541 N.W.2d 725, 733 (S.D.1995); *Bridge v. Karl's, Inc.,* 538 N.W.2d 521, 523 (S.D.1995).

[¶ 11.] Border States argues that a new trial should have been granted because the evidence did not justify the verdict or that the verdict was against the law. We review a trial court's denial of motion for new trial under the following standard:

Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion. If the trial court finds an injustice has been done by the jury's verdict, the remedy lies in granting a new trial. We determine that an abuse of discretion occurred only if no judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion. Finally, we note a decision to grant a new trial stands on firmer footing than a decision to deny a new trial.

*Schuldies,* 1996 SD 120 at ¶ 8, 555 N.W.2d at 95 (quoting *Junge,* 519 N.W.2d at 31 (citations omitted)).

## ANALYSIS AND DECISION

[¶ 12.] **1. Whether the trial court's denial of Border States' motions for directed verdict and judgment NOV was proper?**

[¶ 13.] The construction of a written contract is a question of law. *Alverson v.*

*Northwestern Nat'l Cas. Co.*, 1997 SD 9, ¶ 5, 559 N.W.2d 234, 235 (citations omitted). Whether the language of a contract is ambiguous is also a question of law. *Mooney's Inc. v. South Dakota Dep't of Transp.*, 482 N.W.2d 43, 46 (S.D.1992). We review questions of law de novo. *Alverson*, 1997 SD 9 at ¶ 5, 559 N.W.2d at 235.

[¶ 14.] We agree with the trial court that the contract, as modified by the change order, was not ambiguous. Border States president, Dan Thompson, voluntarily executed the change order with DOT in order to finish the paving project and avoid incurring the expenses of returning to Highway 46 the following year. Thompson testified that upon receiving the change order he believed if Border States complied with conditions 1–5, it would not be responsible for any raveling or surface defects "due to cold weather asphalt concrete work" uncovered in the spring 1994 inspection as set out in condition 6. However,

> [t]o permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.

*LPN Trust v. Farrar Outdoor Adver., Inc.*, 1996 SD 97, ¶ 13, 552 N.W.2d 796, 799 (quoting 17A Am.Jur.2d *Contracts* §§ 224–28 (1991)).

[¶ 15.] The plain meaning of the change order, read as a whole, unambiguously manifests Border States' acceptance of the risk of raveling or surface defects for the work completed after October 15, 1993. It is in the nature of a guarantee or warranty. "As a general principle, one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party." *LPN Trust*, 1996 SD 97 at ¶ 13, 552 N.W.2d at 799 (citations omitted). Border States bargained for the opportunity to complete the project in 1993. By accepting the risk of defects caused by cold weather paving, Border States saved the expenses of having to return its crew and equipment to Yankton the following year.

[¶ 16.] **2. Whether the trial court's denial of Border States' motion for new trial was proper?**

[¶ 17.] The evidence presented at trial clearly supports the jury's verdict in favor of DOT. Conflicting expert testimony was presented as to the cause of the defects in the road. DOT presented the jury with a substantial amount of competent evidence that the defects were caused by paving after the seasonal deadline, a risk contractually assumed by Border States. The physical evidence from the Highway 46 project supported DOT's claim that the defects were caused by cold weather paving. A DOT expert, Mark Blow, testified that Border States' contention that a defect resulted from the "mix design" supplied by DOT was erroneous. Blow testified that if a mix design had been the cause, then the surface defects would have been consistent throughout the project. Examination of the Highway 46 project clearly showed otherwise as the defects were sporadic and most severe on the final sections of the project paved latest in the season during the coldest weather. In addition, evidence was presented from core samples which were cut from the pavement and indicated that the second and final course was in substantially worse condition than the first course that was placed in warmer temperatures. We find that sufficient evidence was presented at trial to support the jury verdict that DOT was not responsible for the defects in the Highway 46 project.

[¶ 18.] Equally without merit is Border States' contention that it was not responsible for the delay and therefore DOT improperly assessed 19 days in liquidated damages. DOT presented the jury with evidence that Border States' aggregate subcontractor, Weatherton, had available and accessible a substantial amount of the materials needed for the project at a time when Border States could have finished the project before the October 15, 1993 deadline. However, Border States decided to keep its crew and equipment working on the Hill City project to avoid the costs associated in a transfer of several hundred miles.

[¶ 19.] Border States contends that the detailed plans and specifications pre-

pared by DOT for the project gave rise to an implied warranty as to accuracy. Border States argues it should not be held responsible, as a matter of law, where DOT's plans and specifications were fully complied with but were defective and were the cause of the defects in the paving. Border States attempts to support its position with this Courts holding in *Mooney's*, 482 N.W.2d at 44, wherein we cited *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166, 169 (1918):

> Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work.

[¶ 20.] In *Mooney's*, we upheld a summary judgment for DOT on the implied warranty issue because the construction contract was unambiguous and:

> In allocating ... risk, courts have universally applied a rule first expounded in a line of Supreme Court cases. The rule provides that the government is not liable to a contractor for breach of implied warranty unless it misrepresents material facts through concealment or false statements. In essence, this rule established that no implied warranty will arise when the government, in good faith, presents all the information it has on ... conditions to the contractor.

*Id.* at 46. As in *Sundt Corporation v. State, By and Through South Dakota Department of Transportation*, 1997 SD 91, 566 N.W.2d 476, and *Mooney's, supra*, Border States fails to produce evidence that DOT made any misrepresentation through concealment or false statements of material fact which could provide the basis of a breach of an implied warranty.

[¶ 21.] Furthermore, the jury was specifically instructed that Border States is entitled to "recover the increased costs for the repair work and the liquidated damages" if it found that "faulty or defective specifications prevented or delayed Border States' completion of the project." We presume that the jury followed this instruction. Thus, it is evident in light of the verdict and the evidence that the jury did not believe that DOT's plans or specifications were defective.

[¶ 22.] Border States next argues that the verdict is against the law since it complied with change order conditions 1–5, and it did not engage in any "cold weather asphalt concrete work" as stated in condition number 6. This argument is without merit as Border States' witnesses believed that "cold weather asphalt concrete work" was synonymous with "late season paving" or paving after the seasonal deadline of October 15. *See* SDDOT Standard Specifications for Roads and Bridges, § 320.3A (providing weather and seasonal limitations).

[¶ 23.] We find Border States' additional arguments without merit and therefore affirm.

[¶ 24.] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.