1999 SD 56

**David S. DINSMORE, Plaintiff and Appellee,**

v.

**PIPER JAFFRAY, INC. and David P. Stevens, Defendants and Appellants.**

No. 20661.

Supreme Court of South Dakota.

Argued Feb. 23, 1999.

Decided May 12, 1999.

Arlo Sommervold of Scott Hoy Law Office, Sioux Falls, for plaintiff and appellee.

Monte R. Walz and Keith A. Gauer of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellants.

JOHNS, Circuit Judge.

[¶ 1.] Piper Jaffray, Inc. (Piper) and David Stevens (Stevens), appeal circuit court orders denying their joint motion to stay proceedings and compel arbitration in an action filed by David Dinsmore (Dinsmore).

[¶ 2.] We reverse and remand.

## FACTS

[¶ 3.] In 1988, because of his prior experience with securities brokers and pre-dispute arbitration provisions, Dinsmore searched for a securities brokerage firm that would consent to an account agreement without an arbitration clause. In that same year Dinsmore declined opening a new account with Mesirow Financial, Inc., because of its insistence on a pre-dispute arbitration provision. In October 1988, upon Dinsmore's request, Piper, through its agent, Stevens, orally agreed to waive the pre-dispute arbitration provision. They then struck it from the pre-printed margin agreement form that Dinsmore signed.[1]

[¶ 4.] Two years later, in October 1990, Dinsmore and Piper entered into two additional agreements, a cash account agreement and a customer options agreement. Both of these agreements, in addition to a 1996 customer options agreement between the parties, included pre-dispute arbitration provisions in their pre-printed forms. There was no discussion between Dinsmore and Stevens regarding the existence of arbitration clauses in these three subsequent agreements. The two customer options agreements each contained an identical pre-dispute arbitration provision in paragraph twelve.[2]

1. The stricken arbitration provision stated:
   **9. Customer Agrees to Arbitrate.** This Agreement and its enforcement shall be governed by the laws of the State of Minnesota. We acknowledge that this Agreement is being entered into to facilitate, among other things, my ability to buy and sell securities on national exchanges and markets, and that this Agreement therefore involves interstate commerce. We specifically agree and recognize that all controversies which may arise between Piper, Jaffray & Hopwood Incorporated, its agents, representatives or employees and me, concerning any transaction, account or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on, or subsequent to the date hereof, shall be determined by arbitration to the fullest extent provided by law. Such arbitration shall be in accordance with the rules then if effect, of the Arbitration Committee of the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. as I may elect. I authorize you, if I do not make such election by registered mail addressed to you at your main office with fifteen (15) days after receipt of notification from you requesting such election, to make such election on my behalf.

2. The bold-faced arbitration provision in both of the customer options agreements stated:

   12. Agreement to Arbitrate.
   • Arbitration is final and binding on the parties.
   • The parties are waiving their right to seek remedies in court, including the right to a jury trial.
   • Pre-arbitration discovery is generally more limited than and different from court proceedings.
   • The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek a modification of rulings by the arbitrators is strictly limited.
   • The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
   I agree to arbitrate any disputes between PJH and me. I specifically agree and recognize that all controversies which may arise between PJH, its agents, representatives or employees and me, concerning any transaction, account or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on, or subsequent to the date hereof, shall be determined by arbitration to the full extent provided by law. Such arbitration shall be in accordance with the rules then in effect, of the Arbitration Committee of the New York Stock Exchange, Inc. or the National Association of Securities Deal-

[¶ 5.] In each of the subsequent agreements Dinsmore signed his name directly below a bold-faced statement which, if read, would alert the customer to the arbitration clause in the body of the agreement. The 1990 cash account agreement contained such a provision directly above the signature line, but below the date line. The provision stated:

Date:    10/4/90

**I UNDERSTAND THAT THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 9 ABOVE.**

Address: 1101 S Minnesota Ave   [David S. Dinsmore]

(Customer's Signature)

Sioux Falls SD 57105    David S. Dinsmore

(Print Name)

[¶ 6.] The 1990 customer options agreements contained the following provisions:

I CONFIRM THAT I HAVE READ AND THAT I UNDERSTAND THE INFORMATION CONTAINED IN THIS BOOKLET. I AM AWARE OF THE SPECIAL RISKS AND OBLIGATIONS OF OPTIONS TRADING. I HAVE READ AND UNDERSTAND THIS AGREEMENT AND I AM BOUND BY IT.

DATE[OCT 3] ,19    [90]

**I UNDERSTAND THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE ON PAGE 2, PARAGRAPH 12.**

SIGNATURE(S)  [David S. Dinsmore]
§

It appears from the agreement that Dinsmore both dated and signed this agreement in the same color ink. The bold-faced provision, designed to alert the customer of the arbitration clause in the document, is clearly positioned between the date and signature lines.

[¶ 7.] The March 1996 customer options agreement contained provisions very similar to the 1990 customer options agreement. It stated:

ers, Inc. as I may elect. I authorize PJH, if I do not make such election by registered mail addressed to PJH at its main office within 15 days after receipt of notification from PJH requesting such election, to make such election on my behalf.

I CONFIRM THAT I HAVE READ AND THAT I UNDERSTAND THE INFORMATION CONTAINED IN THIS BOOKLET. I AM AWARE OF THE SPECIAL RISKS AND OBLIGATIONS OF OPTIONS TRADING. I HAVE READ AND UNDERSTAND THIS AGREEMENT AND I AM BOUND BY IT.

Date_____[3–18]_____, 19[96]

**BY SIGNING THIS AGREEMENT I:**

1. **UNDERSTAND THIS AGREEMENT CONTAINS A PRE- DISPUTE ARBITRATION CLAUSE ON PAGE 2, PARAGRAPH 12.**

2. **ACKNOWLEDGE RECEIPT OF A COPY OF THIS AGREEMENT.**

[David S. Dinsmore]       [3–18–96]

Customer Signature         Date

[¶ 8.] Dinsmore subsequently brought suit for money damages, claiming Piper engaged in improper trading practices. Piper, because of the pre-dispute arbitration provisions, then moved the trial court to stay the action and compel arbitration. The trial court denied the motion concluding that Piper owed Dinsmore a fiduciary obligation to advise Dinsmore of the presence of the arbitration provisions and that Piper breached this duty by failing to make an oral disclosure.

### ISSUE

[¶ 9.] **Does a securities broker owe a fiduciary duty to a client to orally advise the client of a pre-dispute arbitration provision when the parties change the contractual relationship then existing between them?**

### ANALYSIS

[¶ 10.] "The Federal Arbitration Act (FAA) preempts state law and governs all written arbitration agreements in contracts involving interstate commerce. *Allied–Bruce Terminix Int'l Co. v. Dobson*, 513 U.S.

The arbitration provision in the cash account agreement appears in paragraph nine immediately before the date line; it is in bold-faced type; and it reads essentially the same as paragraph twelve in the customer options agreements.

265, [270–72], 115 S.Ct. 834, 838, 130 L.Ed.2d 753, 763 (1995)." *Dakota Wesleyan Univ. v. HPG Intern. Inc.*, 560 N.W.2d 921, 922 (S.D. 1997). Since the instant contracts involve interstate commerce, we begin our analysis by looking to the act.

[¶ 11.] The FAA at 9 USC § 2 provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, *shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.* (emphasis added).

While the FAA evidences a strong federal policy favoring the enforcement of arbitration agreements [3], the question of whether the parties entered into a valid agreement to arbitrate is a question for the court to determine applying state contract law principles. *First Options v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) [4]; *Houlihan v. Offerman & Company, Inc.*, 31 F.3d 692, 694–695 (8th Cir.1994).[5]

[¶ 12.] Dinsmore signed the three contracts in question at different times without reviewing them. Each of the contracts contain a bold-faced, clear, and conspicuous notice that the documents contain a predispute arbitration clause. These notices appear immediately preceding the signature lines and direct ones attention to the location of the clause within the documents. In South Dakota and "[a]s a general principle, one who accepts a written contract is conclu-

sively presumed to know its contents and assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party." *Thunderstik Lodge, Inc. v. Reuer*, 585 N.W.2d 819, 823 (S.D.1998) (quoting *Flynn v. Lockhart*, 526 N.W.2d 743, 746 (S.D.1995)) (quoting 17A AmJur2d *Contracts* § 224 (1991)); *Border States Paving, Inc. v. State Dept. of Transportation*, 574 N.W.2d 898, 902 (S.D.1998); *LPN Trust v. Farrar Outdoor Adver. Inc.*, 552 N.W.2d 796, 799 (S.D.1996).

> Thus, ignorance of the contents of a contract expressed in a written instrument does not ordinarily affect the liability of one who signs it or who accepts it otherwise than by signing it. If a person acts negligently and in such a way as to justify others in supposing that the writing is assented to by him, he will be bound both at law and equity, even though he supposes that the writing is an instrument of an entirely different character.

17A AmJur2d *Contracts* § 224 (1991). The reason for this rule is simple. "To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but not read it or know its stipulations would absolutely destroy the value of all contracts." *Border States Paving, Inc. v. State Dept. of Transportation*, 574 N.W.2d 898, 902 (S.D.1998) (quoting *LPN Trust v. Farrar Outdoor Adver. Inc.*, 552 N.W.2d at 799).

[¶ 13.] The evidence is that no one from Piper did anything to dissuade Dinsmore from reading the documents and made no actual misrepresentations concerning the presence or absence of arbitration provisions. While Dinsmore acknowledges that he willingly signed the documents, he argues that he did not willingly agree to the arbitration

---

3. See short history of FAA found in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26, 36 (1991).

4. "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943, 115 S.Ct. at 1924, 131 L.Ed.2d at 993. (citations omitted). "When deciding whether the parties agreed to arbitrate a

certain matter (including arbitrability), courts generally ... should apply ordinary state law principles that govern the formation of contracts." *Id.*

5. "Before a party may be compelled to arbitrate under the Federal Arbitration Act, the ... court must engage in a limited inquiry to determine whether a valid agreement to arbitrate exists between the parties." *Houlihan*, 31 F.3d at 694.

provisions. The gravamen of his complaint is that Piper failed to orally point out to him the presence of the arbitration provisions before he signed the documents. His excuse for not reading the documents is that he assumed, since he and Piper agreed in 1988 that there would be no arbitration provision in the margin agreement, Piper would not include an arbitration clause in the later agreements without first discussing it with him. Without some special duty on the part of Piper to make the oral disclosures, Dinsmore is bound under our case law to all aspects of the contracts even though he may have negligently assumed that the documents did not include arbitration provisions.

[¶ 14.] The trial court held that Piper did have a duty to make the oral disclosures based on the fact that a fiduciary relationship was established between Piper and Dinsmore at the time the October 8, 1988, agreement was entered into. The court reasoned that the fiduciary relationship required Piper to make full and complete disclosure of all material facts; that the presence of the arbitration provisions was a material fact; and, that Piper's failure to orally note the arbitration provisions constituted a breach of Piper's duty to disclose all material facts. The court further and finally reasoned that because of the breach, Dinsmore was entitled to avoid the arbitration provisions.

[¶ 15.] "The existence of a fiduciary duty and the scope of that duty are questions of law." *Genetics Research v. J K Mill–Iron Ranch,* 535 N.W.2d 839, 842 (S.D.1995) (citing *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 839 (S.D.1990)). Thus, they are fully reviewable by this court and we "afford no deference to the conclusions reached by the trial court." *Kroupa v. Kroupa,* 574 N.W.2d 208, 210 (S.D.1998).

[¶ 16.] Although Piper apparently does not take issue with the general proposition that a securities broker may owe its client fiduciary duties in various aspects of their relationship, it does take issue with the proposition that a broker has a duty to orally explain the terms of a customer account agreement which sets forth the basis for the relationship between broker and client. In support of this position Piper notes that Dinsmore has not cited any case from South Dakota or any other jurisdiction which has held that a securities broker owes a duty to verbally disclose and discuss arbitration provisions in a customer account agreement. In fact, the only case on point is *PaineWebber, Inc. v. Voorhees,* 891 S.W.2d 126 (Mo.1995). There the court stated that under Missouri law, a securities broker owes a fiduciary duty to disclose material facts to his customer. *Id.,* 891 S.W.2d at 129. The court went on to hold that "[a] stockbroker's duty to disclose material facts does not, however, include an obligation to discuss orally with a competent party conspicuous written provisions like the arbitration and loan clauses here." *Id.,* 891 S.W.2d at 130. (citations omitted). No rationale was given for this holding.

[¶ 17.] The nature of the securities broker/customer relationship in South Dakota has been addressed once by this court and once by the Eighth Circuit United States Court of Appeals. In *Cody v. Edward D. Jones & Co.,* 502 N.W.2d 558 (S.D.1993), Cody sued Company for damages for deceit as the result of various financial investments made by Company for Cody. Cody received a judgment and Company appealed claiming, among other things, that the trial court improperly instructed the jury in jury instruction number 14. In jury instruction number 13 the court instructed that a fiduciary relationship existed between Company, as securities broker, and Cody, as its client and also laid out the duties in broad terms. Company did not object to the giving of this instruction. In instruction number 14 the court listed specific duties that a broker owes to his client including a duty "not to misrepresent any fact material to the transaction." *Cody,* 502 N.W.2d at 562. Company argued on appeal that it was improper to give instruction number 14 citing "*DeSciose v. Chiles, Heider & Co. Inc.,* 239 Neb. 195, 476 N.W.2d 200 (1991), for the proposition that no fiduciary relationship arises merely because of a broker-client relationship." *Cody,* 502 N.W.2d at 563. We held that by not objecting to instruction number 13, Company was precluded from disputing the existence of a fiduciary relationship for purposes of instruction number 14. We went on to hold

that instruction number 14 was a correct statement of the law.

[¶ 18.] In *Cody,* when discussing instruction number 13 and its pronouncement that a fiduciary relationship existed between Company and its customers, we referred to *Davis v. Merrill Lynch, Pierce, Fenner, and Smith,* 906 F.2d 1206, 1215 (8th Cir.1990). There the court was called upon to predict what this Court would do when presented with the question of whether a fiduciary relationship would lie between a securities broker and his or her customers. It held, after considering our cases on the relationship between real estate brokers and their clients, that a fiduciary relationship did exist.

> After careful review of South Dakota law, we hold that the district court's decision to instruct the jury that a fiduciary relationship exists between brokers and their customers was not fundamentally deficient in analysis or otherwise lacking in reasoned authority. Eighty years ago, the South Dakota Supreme Court held that real estate brokers owe a duty to their clients. The court held as follows:
>> The relation of an agent to his principal is ordinarily that of a fiduciary, and, as such, it is his duty to act with entire good faith and loyalty for the furtherance and advancement of the interest of his principal in all dealings or affecting the subject-matter of his agency. And this rule is just as applicable to an agent whose duty it is to find a purchaser for the real estate of his principal as any other. Such an agent owes to his principal the obligation of securing for the principal the highest price he can obtain for such property.
>
> *Durand v. Preston,* 26 S.D. 222, 128 N.W. 129, 131 (1910) (citation omitted). The South Dakota Supreme Court recently reaffirmed that the relationship between a real estate broker and his or her clients is a fiduciary one, holding that the broker owes clients "a duty of utmost good faith, integrity, and loyalty." *Hurney,* 308 N.W.2d at 768.[6] The *Hurney* court reasoned that a fiduciary duty should be imposed on real estate agents or brokers because "[a] real estate agent is a licensed professional holding himself out as trained and experienced to render a specialized service. Clients rely on the agent's expertise and expect the agent to act in their best interests." *Id.* (citation omitted). Likewise, securities brokers such as Marks and Ulrich at Merrill Lynch are "licensed professional[s] holding [themselves] out as trained and experienced to render a specialized service." *Id.* Like the clients of real estate agents, securities customers "rely on the agent's expertise and expect the agent to act in their best interests." *Id.* Because we see no significant difference between real estate brokers and securities brokers, we believe that if confronted with the question, the South Dakota Supreme Court would find that securities brokers are fiduciaries that owe their customers "a duty of utmost good faith, integrity and loyalty." *Id.*

*Davis,* 906 F.2d at 1215.

[¶ 19.] We agree with the *Davis* court that securities brokers owe, at least, the same fiduciary obligations to their clients as do real estate brokers, viz. "a duty of utmost good faith, integrity and loyalty." *Id.,* 906 F.2d at 1215. Investors, as a rule, employ securities brokers to perform specialized financial services and entrust the brokers with the authority to act for them. This repose of trust in the broker, that the broker will act in the client's best interest, is a mark of a fiduciary relationship. "A fiduciary relationship is founded upon a 'peculiar confidence' and 'trust placed by one individual in the integrity and faithfulness of another'. When such relationship exists, the fiduciary has a 'duty to act primarily for the benefit' of another." *Genetics Research v. J K Mill–Iron Ranch,* 535 N.W.2d 839, 842 (S.D.1995) (quoting *Garrett v. BankWest, Inc.,* 459 N.W.2d at 839).

[¶ 20.] While a fiduciary relationship does exist between securities brokers and their clients, fiduciary duties are not owed when the parties are dealing at arm's length.

"Generally, in a fiduciary relationship, the property, interest or authority of the other

6. *Hurney v. Locke,* 308 N.W.2d 764, 768 (S.D. 1981).

is placed in the charge of the fiduciary." *Garrett v. BankWest, Inc.,* 459 N.W.2d at 837–38; *Nelson v. WEB Water Dev. Ass'n,* 507 N.W.2d 691, 698 (S.D.1993). South Dakota law reflects "the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit. The law will imply such duties where one party to a relationship is unable to fully protect its interests and the unprotected party has placed its trust and confidence in the other."

*Genetics Research v. J K Mill–Iron Ranch,* 535 N.W.2d at 842 (quoting *Taggart v. Ford Motor Credit Co.,* 462 N.W.2d 493, 500 (S.D. 1990) (citing SDCL 55–7–2(2))).

[¶ 21.] The contracts in this case govern the nature and extent of the business relationship between Dinsmore and Piper. They allow Dinsmore the opportunity to participate in differing types of securities trades and/or otherwise set forth the circumstances under which the two will do business together. By the actual process of negotiating and executing these contracts Piper does not manage Dinsmore's property nor does it act for or on behalf of Dinsmore. Piper acts on its own behalf.

[¶ 22.] Furthermore, there is no evidence in the record which would indicate that Dinsmore was unable to protect his interests as they relate to the negotiation and execution of these agreements although there is evidence that he did rely on his initial oral understanding with Piper that there would be no arbitration. Dinsmore's reliance, however, is not justified considering that these contracts are on pre-printed forms which, by their very design, gave him more than sufficient notice of the presence of the pre-dispute arbitration provisions.

## CONCLUSION

[¶ 23.] The agreements in this case appear to be arms length contracts which pre-suppose that there is no fiduciary duty to explain each and every term of the same. However, under the facts of this case we do not have to reach this issue. We hold that the bold-faced, clear, and conspicuous notices, designed to alert a signer to the presence of the pre-dispute arbitration clauses, discharged any duty that Piper had to act with the utmost good faith in its relations with Dinsmore. Given the nature of these notices we fail to see any good reason why an oral notice must also be given to discharge any duty owed to Dinsmore.

[¶ 24.] The orders of the circuit court are reversed and this matter is remanded with instructions that the circuit court grant Piper and Stevens' joint motion to stay proceedings and compel arbitration.

[¶ 25.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.

[¶ 26.] JOHNS, Circuit Judge, for SABERS, Justice, disqualified.