1999 SD 114

Amos YELLOWBACK, Jr., Special Administrator of the Estate of Brian Yellowback, Deceased. Plaintiff and Appellant,

v.

CITY OF SIOUX FALLS and Dave Dunteman, in His Capacity as a Police Officer and Individually, Defendants and Appellees.

No. 20719.

Supreme Court of South Dakota.

Argued April 28, 1999.

Decided Aug. 25, 1999.

Scott D. McGregor and Kenneth R. Dewell of Viken, Viken, Pechota, Leach & Dewell, Rapid City, South Dakota, Attorneys for plaintiff and appellant.

Gary P. Thimsen and Tim R. Shattuck of Woods, Fuller, Shultz & Smith, Sioux Falls, South Dakota, Attorneys for defendants and appellees.

FITZGERALD, Circuit Judge.

[¶ 1.] Amos Yellowback, Special Administrator of the estate of Brian Yellowback, appeals both the final judgment of the circuit court granting a directed verdict in favor of City of Sioux Falls and Police Officer Dave Dunteman, and the subsequent order denying motion for new trial in this case, which is brought under 42 U.S.C. § 1983 and alleges use of excessive force. Yellowback argues that the court erred in finding that Dunteman enjoyed qualified immunity for his acts, and also argues that the officer's actions were not objectively reasonable under the Fourth Amendment. Further, Yellowback challenges as error the exclusion of certain evidence at trial. Finding no error, we affirm.

## BACKGROUND

[¶ 2.] The pertinent facts are not in dispute. On the evening of August 5, 1993, officers Dunteman and Mundt responded to a dispatched report of a family disturbance. Upon arrival at the reported residence, the officers met Brian Yellowback's mother, who told them that a fight had occurred upstairs, that her son had been stabbed, and that the assailant was still in the house. After climbing the stairs to a room on the second floor of the building, they met a man who had been stabbed near the center of the chest. Dunteman then heard a noise in the closet, and upon opening the closet door, saw Brian Yellowback sitting inside, roughly two feet from the door, in an apparently drunken condition, holding a knife to his own throat. He told officers that he had killed his brother and wanted to kill himself. At least twice Dunteman asked Yellowback to exit the closet and drop the knife, reassuring him that his brother would survive, but he refused to leave.

[¶ 3.] Officer Mundt then took up position at the closet and continued attempts to talk Yellowback out while Dunteman moved away and attempted to radio the police communication center. While standing behind Mundt, Dunteman twice saw Mundt jump back from the closet door. He could not see whether Yellowback had lunged with the knife, but assumed that had occurred. Subsequently, Yellowback emerged from the closet, walking slowly and steadily toward Mundt, still holding the knife to his own throat. Mundt and Dunteman retreated, Mundt repeatedly demanding that Yellowback drop the knife or be shot. When the pair of officers had backed close to the doorway, Dunteman moved laterally to Mundt's left, raised his gun toward Yellowback's chest, and joined repeated warnings to Yellowback to drop the knife or be shot. Yellowback continued slowly advancing toward Mundt, however, saying "shoot me, kill me." At some point, knife still held to his own throat, Yellowback shifted his direction and walked toward Dunteman, until his chest was approximately eighteen to twenty-four inches from the muzzle of Dunteman's raised gun. At that point, the officer fired, hitting Yellowback slightly to the right of his sternum. Mundt then either kicked or pushed Yellowback on to a nearby bed. He stated, "you son of a bitch," sat up and threw the knife at the officers. An ambulance was called and

took Yellowback to a hospital, where he later was pronounced dead.

[¶ 4.] Amos Yellowback, as administrator of the estate of Brian Yellowback, by an amended complaint alleged that both Officer Dunteman and the City of Sioux Falls had violated 42 U.S.C. § 1983, the former because he had used excessive force against the decedent, the latter because the city's alleged failure to establish proper policies and procedures regarding use of force, and to train, inform and supervise its officers regarding use of such force, had resulted in the death.

[¶ 5.] During the course of the trial, the court granted defendants' motions in limine excluding testimony, by a professed expert in police procedures, that the officers had not pursued certain strategies in dealing with Yellowback, and in failing to do so had not acted objectively reasonably. The court also excluded: a copy of portions of the Sioux Falls police department policy and procedures manual concerning use of force and mental cases; personnel records of Dunteman, and an equipment list showing that batons were issued to officers.

[¶ 6.] At the close of the plaintiff's case, the court granted the defendant's motion for a directed verdict, finding that Dunteman was entitled to qualified immunity as a matter of law, and that his actions in shooting Yellowback "were not objectively unreasonable." Since Dunteman was not liable, the court additionally dismissed the case against the city. The court also subsequently denied plaintiff's motion for new trial, which motion rested largely on allegation of error in excluding the evidence mentioned above.

## DISCUSSION

### *Directed Verdict*

[¶ 7.] Regarding the directed verdict against him, plaintiff argues that the officer did not possess qualified immunity, and that the facts show that Dunteman's actions were not "objectively reasonable"

and consequently violated the Fourth Amendment; alternatively he argues that those facts create an issue for the jury. Specifically, he claims that the decedent's actions, including placing the knife at his own throat, indicated suicidal intent.

[¶ 8.] Our standard for reviewing a grant of directed verdict is well settled:

A motion for a directed verdict under SDCL 15–6–50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

*Border States Paving Inc. v. State, Dept. of Transp.*, 1998 SD 21, ¶ 10, 574 N.W.2d 898, 901.

[¶ 9.] Discussion of whether qualified immunity is appropriate is logically preceded by the question of whether decedent's constitutional rights were even violated; therefore, that question begins our substantive inquiry. *See Cole v. Bone*, 993 F.2d 1328, 1331 (8thCir.1993)(threshold inquiry is whether plaintiff has asserted a violation of a constitutional right at all). This Court has made clear that all claims that law enforcement officers have used excessive force must be analyzed under the Fourth Amendment's guarantee to citizens of the right "to be secure in their persons ... against unreasonable ... seizures." *Darrow v. Schumacher*, 495 N.W.2d 511, 519 (S.D.1993)(quoting *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443, 454 (1989)). There can be no question that when a citizen has been shot, a seizure has

occurred. *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985).

[¶ 10.] Having decided that Dunteman's shooting of Yellowback constituted a seizure under the Fourth Amendment, we must then decide, viewing the record in the light most favorable to plaintiffs, whether sufficient evidence exists so that reasonable minds could differ regarding whether the shooting violated the Fourth Amendment. More precisely, the question of whether that constitutional violation occurred turns on whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him. *Darrow,* 495 N.W.2d 511 at 519 (citing *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872, 104 L.Ed.2d at 456).

[¶ 11.] We must also analyze that question, however, *from the perspective of the officer at the scene. Id.,* (citing *Graham* 490 U.S. at 396, 109 S.Ct. at 1872). That inquiry is *not* performed with the "20/20 vision of hindsight," *Cole,* 993 F.2d at 1333 (citing *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872), or pursuant to a type of "Monday morning quarterback" approach in which analysis rests on whether the officers should have pursued alternative strategies or a lesser degree of force. *Schulz v. Long,* 44 F.3d 643, 649 (8thCir.1995). Rather, the Fourth Amendment only requires that the officer's actions fall within a *range* of objective reasonableness. *Id.* This "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make ... judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Cole,* 993 F.2d at 1333 (citing *Graham,* 490

U.S. at 396–97, 109 S.Ct. at 1872). Moreover, in cases such as this, where deadly force is used, we apply this deferential perspective to the more specific inquiry of whether "the officer [using the force] has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others." *Schulz,* 44 F.3d at 649 (quoting *Garner,* 471 U.S. at 3, 105 S.Ct. at 1697, 85 L.Ed.2d 1). We recognize that the decision to shoot can often "only be made after the briefest reflection, so brief that 'reflection' is the wrong word." *Plakas v. Drinski,* 19 F.3d 1143, 1149 (7thCir.1994).

[¶ 12.] With this background in mind, reasonable minds could not differ over the conclusion that Dunteman had probable cause to believe that Yellowback posed a significant threat of death or serious bodily injury to both officers, and that use of deadly force in that circumstance was objectively reasonable. The fact that Yellowback used suicidal language and placed his knife to his chin could not reasonably negate the very significant risk he might stab one of the officers.[1] From Dunteman's perspective he knew that Yellowback had just stabbed another man in the chest, that he was drunk, that Mundt had twice jumped back from the closet in a manner that reasonably indicated that Yellowback had made a sudden aggressive movement, that he had advanced to a point at which he could easily have lunged and stabbed Dunteman, and that he was moving still closer. Even if the Court were allowed to use 20/20 hindsight from our safe vantage point, we could not reasonably dismiss the risk that any suicidal impulse Yellowback might have had was coupled with or even a mere facade for an aggressive desire to harm the officers;[2] clearly we could not

---

1. Indeed, the fact that Yellowback angrily swore and threw his knife at the officers after being shot, while obviously not a fact faced by Dunteman before the shooting, still illustrates the folly of assuming there was no risk of aggressive behavior present.

2. *See, e.g. Plakas,* 19 F.3d at 1146, in which decedent, facing police while handcuffed and holding a fireplace poker, repeatedly made statements like "Go ahead and shoot. My life isn't worth anything," before cocking the poker overhead to swing at the officer from a distance of two arms lengths. The officer

expect an officer in Dunteman's rapidly evolving position to assume he was not at significant risk.[3] Since the officer acted reasonably, there was no Fourth Amendment violation.

[¶ 13.] Our conclusion is further buttressed by the case of *Krueger v. Fuhr,* 991 F.2d 435 (8thCir.1993), in which the 8th Circuit reversed the denial of summary judgment requested by an officer who had shot a fleeing suspect who, according to dispatch, possessed a knife and was probably under the influence of drugs. During a chase on foot in which the officer had closed to within three or four yards of the suspect, the latter pulled a knife from his waistband. *Id.,* at 437. The officer, fearing that the suspect would turn around and attack him with the knife, and afraid that he would not be able to stop in order to avoid the attack, shot the suspect in the back. *Id.* In reversing the district court's denial of summary judgment, the 8th Circuit determined that it was objectively reasonable for the officer to believe that he faced a serious and immediate danger of physical harm when the suspect pulled or even just seemed to pull, a knife from his waistband. *Id.,* at 439. In this case, Dunteman's torso was roughly four *feet* from Yellowback, his extended hands only a little more that twenty-four inches away,

and Yellowback faced and advanced toward him. Dunteman faced as much if not more risk than the officer in *Krueger.*

[¶ 14.] Given that the trial court had excluded the expert testimony regarding police procedure, the portions of the policy manual, the equipment list and Dunteman's personnel records, they were not before the court at the time of the motion to direct a verdict, and we will only address those pieces of evidence in connection with the denial of the plaintiff's motion for new trial.

[¶ 15.] Since no constitutional violation occurred, logically there is no need to pursue the qualified immunity inquiry further. Since there was no violation of law, there is no need to inquire whether a reasonable officer would have known that his conduct violated clearly established law. *See Cole,* 993 F.2d at 1334; *Krueger,* 991 F.2d at 439.

## Motion for New Trial

[¶ 16.] The test for whether officers constitutionally used deadly force also disposes of plaintiff's argument that he deserves a new trial.[4] He firsts protests the lower court's exclusion of evidence of different strategies that he alleges the officers should have used before shooting Yellowback.[5] Further, plaintiff finds grounds

shot and killed the aggressor and the court found no excessive force. *Id.,* at 1146–1151.

3. Even appellant's briefed arguments impliedly contradict each other over the degree of risk posed by Yellowback. On one hand he argues that evidence of Yellowback's suicidal intent renders the officer's use of force excessive and unreasonable, implying that decedent meant the officers no harm. On the other hand, appellant later argues that the trial court erred by not admitting expert testimony that officers should have used other means to control decedent, including shutting him in the closet or wielding a mattress from a nearby bed. But this latter argument effectively concedes the existence of the risk in the first place, only arguing that it could have been diffused by alternative strategies. Appellant's own ambivalence merely highlights the risk actually present.

4. We review a trial court's denial of motion for new trial under the following standard: Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion.... We determine that an abuse of discretion occurred only if no judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion. Finally, we note a decision to grant a new trial stands on firmer footing than a decision to deny a new trial. *Border States Paving, Inc., v. State, Dept. of Transp.,* 1998 SD 21, ¶ 11, 574 N.W.2d 898, 901.

5. This evidence included the testimony of Dr. R. Paul McCauley regarding reasonable police tactics and a list of equipment issued to officers, including batons.

for new trial both in the court's refusal to admit portions of the Sioux Falls Police Department policy manual regarding use of force and handling of mentally unstable persons, and in the refusal to admit portions of Dunteman's personnel file allegedly showing that he been insufficiently disciplined for previous transgressions. Plaintiff's alleged expert referred to this evidence in conjunction with proffered testimony that deficient policy and insufficient disciplinary action by the department were a "moving force" behind the officer's acts. None of this evidence, however, was admissible.

[¶ 17.] Plaintiff's argument for admission of this alleged evidence of alternative preventative strategies ignores the rule that, as the court in *Schulz* stated, "[t]he Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Id.*, at 648 (quoting *Cole*, 993 F.2d at 1333). We limit our scrutiny of the seizure in this case to this question: at the moment of the shooting did Dunteman have probable cause to believe that Yellowback posed a significant threat of death or serious physical injury to himself or others? *See Schulz*, 44 F.3d at 649. The answer to that question is clearly "yes," and the proffered evidence—that the officer might have pursued other methods before that probable cause arose—is simply irrelevant.[6] Consequently, the exclu-

sion of this evidence could not provide grounds for a new trial.

[¶ 18.] Since Dunteman committed no constitutional violation, the trial court's rejection of evidence of police department policy or prior disciplinary actions does not provide grounds for a new trial. A city cannot be liable in connection with an excessive force claim, whether on a failure to train theory or a municipal custom or policy theory, unless the officer is found liable on the underlying substantive claim. *See Abbott v. City of Crocker, Mo.*, 30 F.3d 994 (8thCir.1994). As outlined above, Dunteman is not liable on the substantive claim. Consequently, we need not even discuss the trial court's exclusion of the policy manual provisions and Dunteman's personnel file.[7]

## CONCLUSION

[¶ 19.] Since decedent's constitutional rights were not violated, the court did not err by granting a directed verdict. Neither did it err by not granting the request for a new trial, as it correctly excluded the proffered evidence at issue. Therefore, we affirm the trial court's judgment.

[¶ 20.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.

[¶ 21.] FITZGERALD, Circuit Judge, for SABERS, Justice, disqualified.

---

6. Of course, where there is simply no evidence of what happened at the point of the use of deadly force, evidence of preceding events may be relevant to conflicting inferences about what subsequently occurred. For example, In *Gardner v. Buerger*, 82 F.3d 248, 250 (8thCir.1996), in which an officer shot an unarmed man in the back of the head, no one testified at trial about the shooting itself, only about the events preceding the shooting. Under those circumstances, the Eighth Circuit reversed the trial court's summary judgment in favor of the officer, finding that evidence of the events leading up to the shooting created a sufficient issue *about the*

actual seizure—the shooting—for the jury to decide. *Id.*, at 253. By contrast, here the evidence pertaining to Dunteman's probable cause to believe he was endangered is undisputed and supports no conflicting interpretations.

7. Plaintiff does not clearly discuss the specific import of these items in his brief, but they were referenced by the doctor in his officer of proof to support allegations that the actions or policies of the city had "moved" Dunteman's actions.