67551, 67552. DELTA DIVERSIFIED, INC. et al. v. CITIZENS & SOUTHERN NATIONAL BANK; and vice versa.

SOGNIER, Judge.
Citizens & Southern National Bank (CSNB) sued Delta Diversi-

fied, Inc., Delta Carpets, Inc. (hereinafter the corporations are referred to collectively as "Delta"); Delta's principal shareholders and officers, James C. Barbre and Paul H. Chance; their wives, Barbara Barbre and Vivian Chance; and others not parties to this appeal, seeking to recover against Delta on separate series of notes and against the individuals on their guaranties (sureties). The Citizens & Southern Financial Corporation (CSFC), a wholly owned subsidiary of CSNB, was also named as a defendant to require it to marshal the assets of Delta, but was later dismissed.

Between 1974 and 1979, Delta had factoring agreements with CSFC under which CSFC agreed to purchase accounts receivable from Delta in exchange for a percentage of billings plus interest on amounts advanced. At the suggestion of CSFC, Delta undertook to procure long-term financing with CSNB as the lender under a federally-guaranteed loan program sponsored by the Farmers Home Administration (FmHA). In December 1976, the loan closed and Delta gave CSNB two promissory notes (Series A and B Notes) for principal amounts totaling 4 million dollars. James Barbre, Paul Chance, and Barbara Barbre executed an unconditional guaranty (surety) of the indebtedness. In 1978, Delta procured an additional $600,000 through the FmHA program, executing two additional promissory notes (Series C and D Notes). Barbre, Chance, and their wives executed an unconditional guaranty (surety) of these notes. The companies defaulted on the notes and in 1979, CSNB declared the entire amount of the outstanding balance of principal and accrued interest due and brought the instant action.

Delta went into voluntary liquidation under Chapter 7 of the Bankruptcy Code of 1978 and the action was stayed as to it. CSNB and defendants Barbara Barbre and Vivian Chance filed motions for summary judgment. The trial court denied the motion of CSNB as it related to issues arising out of two of defendants' several defenses based on discharge and granted summary judgment in favor of CSNB as to all other issues and defenses, including the counterclaim of James Barbre and Paul Chance. The trial court denied the motions for summary judgment of Barbara Barbre and Vivian Chance. All defendants appeal (No. 67551); CSNB cross-appeals (No. 67552).

The Barbres and the Chances take the position that CSNB and its subsidiary, CSFC, secretly held the intent not to continue to extend ledger debt[1] and financial support pursuant to the factoring agreements, but instead to arrange to have FmHA guarantee part of Delta's debt, keep Delta in business long enough to have that portion

---

[1] "Ledger debt" here refers to an obligation to CSFC arising from Delta's purchases from other vendors also factored or financed by CSFC. In such instances, CSFC would pay or credit the vendor and charge Delta.

of the debt not guaranteed by FmHA paid out, then terminate credit and force Delta's liquidation. Central to this position is the treatment of CSFC as the alter ego of CSNB, so that acts of CSFC are attributable to CSNB, which we will assume here for the purpose of argument since all inferences that may be drawn from the evidence must be construed in favor of the Barbres and Chances on motion for summary judgment. *Holland v. Sanfax Corp.*, 106 Ga. App. 1, 5 (126 SE2d 442) (1962).

In writing this opinion, we acknowledge with gratitude the detailed analysis and rulings, supported by excellent authority, of the learned trial judge in his ably drafted order.

1. Appellants Barbara Barbre and Vivian Chance contend that the trial court erred by granting summary judgment in favor of CSNB on their defenses based on CSNB's alleged violation of Chapter 22 of the Bank Holding Company Act, 12 USC §§ 1971-1978, which is directed at tying arrangements involving banks. Appellants rely on 12 USC § 1972 (1) (C), which provides:

"(1) A bank shall not in any manner extend credit . . . on the condition or requirement —

"(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service";

Appellants alleged that the requirement that they act as guarantors (sureties) of Delta's obligations to CSNB constituted the imposition of unusual and unlawful requirements for the extension of credit which were inconsistent with normal banking and credit policies or practices and were, therefore, in violation of the Act.

The trial court determined that CSNB was in apparent violation of the Act, inasmuch as the evidence disclosed that the requirement of the wives' sureties was not a usual or generally accepted prerequisite to the extension of credit and was inconsistently applied. We need not reach this question, however, as we hold that the trial court correctly ruled that the wives could not rely upon CSNB's violation as a defense to their liability because they owned no stock in Delta and were not "customers" under 12 USC § 1972 (1) (C). Swerdloff v. Miami Nat. Bank, 584 F2d 54, 59 (8) (5th Cir. 1978). Thus, the trial court did not err in granting summary judgment in favor of CSNB on this issue.

2. Appellants contend that the trial court erred by granting summary judgment in favor of CSNB on the defense raised by all defendants that CSNB violated the Equal Credit Opportunity Act, 15 USC § 1691 et seq. and Regulation B of the Federal Reserve Board, 12 CFR Part 202. These provisions provide, in pertinent part, as follows:

"(a) It shall be unlawful for any creditor to discriminate against any *applicant*, with respect to any aspect of a credit transaction —

"(1) on the basis of race, color, religion, national origin, sex or *marital status . . . .*" (Emphasis supplied.) 15 USC § 1691 (a) (1).

"(d) *Signature of spouse or other person.*

. . .

"(5) If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the extension of the credit requested, [footnote omitted] a creditor may request that the *applicant* obtain a co-signer, guarantor, or the like. The *applicant's* spouse may serve as an additional party, but a creditor *shall not require that the spouse be the additional party.*" (Emphasis supplied.) 12 CFR § 202.7 (d) (5).

Appellants rely on evidence that when the first loans were closed, CSNB required the surety signatures of Barbara Barbre and another shareholder's wife who is not a party to this appeal, but did not require an additional surety of Paul Chance, who was at that time unmarried. When the second series of loans was closed, Chance was married, and the signature of his wife, as well, was required. Appellants contend that this constituted credit discrimination on the basis of marital status.

Pretermitting the question of whether appellants may interpose the Equal Credit Opportunity Act as a defense to CSNB's claims against them (see discussion In re Remington, 19 BR 718, 719-720 (D. Colo. 1982)), we hold, as did the trial court, that appellants were not "applicants" as defined by either the statute, 15 USC § 1691a (b), or the regulation, 12 CFR § 202.2 (e). See Morse v. Mut. Fed. S&L Assn. of Whitman, 536 FSupp. 1271, 1278 (8) (D. Mass. 1982).

Thus, the trial court did not err in granting summary judgment in favor of CSNB on the appellants' defense brought under the Equal Credit Opportunity Act.

3. Appellants Barbara Barbre and Vivian Chance contend that the trial court erred by granting summary judgment in favor of CSNB on their defense that the surety agreements are void and unenforceable due to a lack of and failure of consideration.

The pertinent language of the surety instrument for the Series C and D Notes signed by both Mrs. Barbre and Mrs. Chance was as follows: "WHEREAS, in order to induce Lender [CSNB] to enter into said Supplemental Note Purchase Agreement and to provide additional protection for the holders . . . of the [Series C and D] Notes, the Guarantors are willing to guarantee the payment of the Notes and the performance of all obligations of the Obligors under the Purchase Agreement . . . ." The earlier surety instrument for the Series A and B Notes signed by Barbara Barbre, but not Vivian Chance, provided: "This Agreement is made in order to induce the Lender [CSNB] to purchase the [Series A and B] Notes and to provide additional protection for the holders thereof . . . ."

Appellants point out that the agreements were executed at a time when Georgia still recognized a distinction between contracts of guaranty and contracts of suretyship. (For current law see OCGA § 10-7-1; Ga. Laws 1981, pp. 870-871.) However, "[w]hether the contract is one of suretyship or guaranty is not determinative of the outcome in this case . . ." and we need not here be particularly concerned with whether the agreements are labelled "guaranty" or "surety." *Dunlap v. C & S DeKalb Bank,* 134 Ga. App. 893, 895 (2) (216 SE2d 651) (1975). See *Griswold v. Whetsell,* 157 Ga. App. 800, 801 (2) (278 SE2d 753) (1981). Nevertheless, the trial court correctly determined that the agreements were contracts of suretyship as they obligated the signers to pay the debt of another (Delta) in consideration of credit or indulgence, or other benefit to his principal, the principal remaining bound therefor. *Dunlap,* supra at 895 (1).

It is undisputed that Delta received the proceeds of the subject loans. Accordingly, there was adequate consideration for the contracts of suretyship, *Griswold,* supra at 802; *Ebner v. Gulf Oil Corp.,* 99 Ga. App. 586, 587 (3) (109 SE2d 81) (1959). The trial court did not err by granting summary judgment in favor of CSNB on this issue.

4. Appellants contend that the trial court erred by granting summary judgment in favor of CSNB "on any issues relating to [Appellants'] assertion that [CSNB's] actions resulted in a discharge of the obligations." The trial court denied CSNB summary judgment on appellants' discharge defenses based on bad faith and fraud, although in Division 9 of this opinion, we reverse the trial court and hold that CSNB was entitled to summary judgment on these issues. Appellants' remaining discharge defenses not included in the "bad faith" or "fraud" categorization are based upon: (a) assumption of control of Delta by CSNB and CSFC; (b) CSNB's breach of fiduciary duty; (c) CSNB's delay in bringing the instant action on the notes; (d) the subordination of certain equipment and stock without the knowledge and consent of Barbara Barbre and Vivian Chance; and (e) impairment of subrogation rights of Mrs. Barbre and Mrs. Chance. We affirm the trial court's granting of summary judgment in favor of CSNB as to each of these defenses on the basis that each has been waived by appellants by the clear language of the surety agreements. *Bobbitt v. Firestone Tire &c. Co.,* 158 Ga. App. 580, 581 (2) (281 SE2d 324) (1981); *Dunlap,* supra at 896 (4).

With respect to the discharge defense based upon subordination of collateral without knowledge or consent of Mrs. Barbre and Mrs. Chance ((d) above), appellants argue that a construction of all pertinent documents favorable to them as non-movants on motion for summary judgment would preclude a disposition of this defense by reliance on the waiver in the surety agreements. Appellants argue that the trust agreements, the notes, and the note purchase agreement,

which with the exception of the surety agreements comprise the documents involved in the loan transactions, require the consent of the sureties to any amendment to the note purchase agreement and the loan transaction. Thus, it is argued, the subordination of 1.7 million dollars in collateral held under the notes constituted an amendment to the loan and note purchase agreement done without the knowledge or consent of Barbara Barbre or Vivian Chance, requiring their discharge. However, the waiver in the surety agreement signed by both provided: "The obligations of the Guarantors [Sureties] . . . shall not be released, discharged or in any way affected by any circumstance or condition (whether or not the Guarantors or any of them shall have any knowledge or notice thereof), including . . . (a) any amendment or modification of or supplement to or waiver with respect to the Purchase Agreement, the Notes, any security for the Notes or any other instrument or agreement contemplated thereby . . . or any release or any security for the Notes . . . ." The surety agreement signed by Barbara Barbre but not Vivian Chance contained a waiver in substantially the same language. Thus, Mrs. Barbre and Mrs. Chance consented in advance to the action taken by CSNB. *Griswold*, supra at 803; *Union Commerce Leasing Corp. v. Beef 'N Burgundy*, 155 Ga. App. 257, 260(3)-261 (270 SE2d 696) (1980); *Citizens &c. Nat. Bank v. Scheider*, 139 Ga. App. 475, 476 (228 SE2d 611) (1976); *Dunlap*, supra at 896 (4).

To the extent that appellants contend the modification constituted a novation resulting in their discharge, Mrs. Barbre and Mrs. Chance waived their right to be informed of or to consent to such novation. *Griswold, Bobbitt*, supra; *Dyna-Comp Corp. v. Selig Enterprises*, 143 Ga. App. 462, 463 (2) (238 SE2d 571) (1977); *Overcash v. First Nat. Bank*, 115 Ga. App. 499, 501-502 (155 SE2d 32) (1967).

The trial court did not err in granting summary judgment in favor of CSNB on the discharge defenses enumerated as (a) through (e) above.

5. Appellants contend that the trial court erred by granting summary judgment in favor of CSNB on the appellants' defense of estoppel. It is argued that CSNB, through CSFC, repudiated its contract with appellants and that its actions have been so inconsistent with the rights of the sureties it is estopped to claim any benefit from the contract. The evidence shows, however, that the actions taken by CSNB and CSFC were authorized by the provisions of the various agreements entered into with Delta and the sureties. See Division 9 (a) below. Appellants have presented no evidence in support of their defense of estoppel and the trial court did not err in granting summary judgment for CSNB on this issue.

6. Appellants contend that the trial court erred by granting summary judgment in favor of CSNB on the defense of failure to meet

conditions precedent to bringing the instant action. Appellants contend that CSNB failed to liquidate all collateral of Delta before bringing this action, and therefore, is estopped because conditions precedent have not been met for the liquidation of a loan under a FmHA program.

Appellants point to no condition in the surety agreements upon which CSNB's right of recovery from the sureties is contingent. See generally *Trust Investment &c. Co. v. First Ga. Bank*, 238 Ga. 309, 310 (2)-312 (232 SE2d 828) (1977). To the contrary, the surety agreements provide that appellants' surety "is in no way conditioned or contingent upon any attempt to collect from the [primary] Obligors with respect to the Notes or any thereof, or upon liquidation of or taking any other action with respect to any security held for the Notes, or upon any other action, occurrence or circumstance whatsoever." The trial court correctly ruled that the unconditional guarantee given in the surety agreements forecloses appellants' defense based on noncompliance with conditions precedent. See *Austin v. Citizens DeKalb Bank*, 143 Ga. App. 680 (239 SE2d 557) (1977).

The trial court did not err in granting summary judgment in favor of CSNB on this issue.

7. Similarly, we hold that contrary to appellants' contention, the trial court did not err by granting summary judgment in favor of CSNB on the counterclaim of James Barbre and Paul Chance, as the surety agreement made their obligations "absolute and unconditional, . . . not . . . subject to any *counterclaim*, set-off, deduction or defense based upon any claim the Guarantors [Sureties] may have against the Obligors . . ., the Trustee, the Lender or any other holder of a Note . . . ." (Emphasis supplied.) See *Bobbitt*, supra. Cf. *Dalton American Truck Stop v. ADBE Distrib. Co.*, 136 Ga. App. 606 (3) (222 SE2d 61) (1975).

8. Appellants contend that the trial court erred in denying the summary judgment motion of Mrs. Barbre and Mrs. Chance. The enumeration is not argued separately, however, and based on our rulings in Divisions 1 through 7 above we hold that the trial court did not err in failing to grant summary judgment in favor of Mrs. Barbre and Mrs. Chance.

9. On cross-appeal, CSNB contends that the trial court erred by denying it summary judgment on the issues of corporate identity and discharge based upon bad faith and constructive fraud. Cross-appellees, as sureties, had pleaded defenses of discharge of debt under OCGA § 10-7-22, claiming that certain acts of bad faith, self-dealing, and fraud by CSNB and CSFC had injured them, increased their risk, and exposed them to greater liability, resulting in their discharge. The issue of corporate identity arose because most of the acts of bad faith and fraud alleged were purportedly committed by CSFC, the

wholly-owned subsidiary of CSNB, plaintiff in the action below. The trial court ruled that whether the corporate veil should be pierced was an issue for the jury. However, we need not reach this question: even conceding as we have, arguendo, that CSFC was the alter ego of CSNB, we hold, nevertheless, that CSNB was entitled to summary judgment on cross-appellees' discharge defenses based on bad faith and fraud.

a. Cross-appellees alleged in their bad faith discharge defense that CSNB, through CSFC, took control of Delta and exercised such control in their own self interests and to Delta's detriment, bringing the instant action after their self interests had been "fully exploited." Cross-appellees contend that such control was exercised by limiting credit and purchasing power and by forcing continued infusion of capital into the reserve accounts which were then charged back. Thus, it is alleged that actions of CSNB and CSFC manifested a bad faith intention to transfer any financial exposure they had in Delta to the sureties. CSNB contends, on the other hand, that all of the actions complained of were authorized under the terms of the factoring agreements and that the trial court erred in denying CSNB summary judgment on this issue.

We have reviewed the evidence, construing it, as we must on motion for summary judgment, most favorably to cross-appellees as the non-moving parties. The evidence disclosed a series of chargebacks made by CSFC after the closing of the loans which are the subjects of the instant action and certain measures of control exercised or imposed by CSFC over Delta's sales, credit, purchasing, payment of debts, and management.

The 4-million-dollar loan represented by the Series A and B Notes was closed in December 1976. Such a loan had been suggested by CSFC in 1974 shortly after it entered into a factoring relationship with Delta, the purpose being to obtain for Delta long-term financing at a lower interest rate. However, despite promises that after the loan closing, CSFC would extend ledger debt to Delta up to 1 million dollars, instead, after disbursement of the loan proceeds, Delta was subject to a $600,000 line of credit. Within two months of the closing, CSFC had charged back the entire $600,000 to Delta reserves.

In February 1977, CSFC forced Delta to change its Nestler Carpet Company account, which had previously been factored through CSFC, so that Delta billed Nestler directly. At this time, Nestler's debt to Delta was approximately $400,000 while its assets were between $20,000 and $30,000. All of Nestler's ledger debt was charged back to Nestler reserves held by CSFC and a deficit of approximately $358,000 charged back to the reserves of Delta.

In August 1977, CSFC prevailed upon principal shareholders James Barbre and Paul Chance to make an additional investment in

Delta in order to generate cash in the reserve account. They gave certain stock to Delta that was ultimately sold for $575,000. The sale proceeds were credited to Delta's factoring account while simultaneously approximately $333,000 of these proceeds were charged back for ledger debt.

In February 1978, the loan of $600,000 represented by the Series C and D Notes was closed and $144,413 of the proceeds were paid to CSFC on ledger debt.

In April 1978, CSNB agreed to subordinate to CSFC its security interest in equipment or stock valued at 1.7 million dollars and held as collateral for the Series A through D Notes. This was done in connection with a $900,000 loan from CSFC to Delta closed in May 1978, and made under conditions of "urgency." In the assessment of one CSNB officer, "If the company [Delta] doesn't get raw materials now to help fill orders, it will have to liquidate . . . . CSFC's loan will buy time for the company." At about the same time, however, CSFC declined to extend any further ledger debt for purchases of raw materials for Delta. As a result, Delta was not able to utilize its yarn heat set division — its most profitable division.

In May or June 1978, CSFC began a series of reserve chargebacks to Delta on the Mastercraft account amounting to $350,000. In October 1978, a chargeback of $74,000 to Delta's reserve was made on the Redfield account under the heading of "customer disputes." CSFC made no response to Delta's protests that because CSFC had placed a $50,000 line of credit on this account and Redfield was insolvent, $50,000 of the chargeback should have been credited to Delta's reserve. The effect of these chargebacks was to exhaust Delta's working capital.

In August 1978, CSFC froze Delta's "No. 1" factoring account and established a "No. 2" account. A lien was placed on all Delta's finished goods and work in process inventory and a collateral control company was hired to supervise production and guard inventories. CSFC then began insisting that outstanding receivables be decreased by decreasing the volume of sales. Credit approval policy became more severe and credit lines were withdrawn. In September 1979, CSFC took possession of all inventory and placed it under armed security. The amount of cash advanced was limited until CSFC had discontinued any advances of funds and Delta closed its operations.

CSNB contends that the chargebacks complained of were necessitated by Delta's factoring unapproved receivables with CSFC and because Delta had incurred a substantial ledger debt. The affidavit of an officer of CSFC showed that between 1974 and 1979, Delta "overshipped" to many customers, including Nestler, Mastercraft and Redfield, by shipping for amounts exceeding the amount of credit approved or shipping to customers whose credit was not approved. In

the affidavit it is further asserted that CSFC exercised its right of recourse by charging back unapproved invoices Delta was attempting to factor, back to the reserve.

The factoring agreements entered into by CSFC and Delta authorized CSFC to retain a reserve from any sums owed to Delta, which reserve could be revised in CSFC's discretion, in order to provide for customer disputes, possible credit losses on unapproved receivables, sums owing to CSFC for purchases by Delta from other firms factored or financed by CSFC (ledger debt), and all other obligations of Delta to CSFC whether arising under the factoring agreements or otherwise. Under the agreements, receivables arising from orders not given written credit approval by CSFC prior to shipment were with full recourse to Delta to the extent of the unapproved amounts. Credit approvals, once granted, could be withdrawn prior to shipment. With regard to sales without credit approval or in excess of any approved line of credit, Delta agreed that CSFC could apply any payments on receivables owing from such customer to any credit approved receivables that were at that time unpaid. Under the agreements, CSFC in its discretion could advance up to 100%, or nothing at all. Further, CSFC had authority to terminate the agreements at any time without notice if it deemed itself insecure.

It is not contended by cross-appellees that the purpose of obtaining the loan represented by the Series A and B Notes was not for Delta's benefit, and the evidence shows that Barbre and Chance agreed with CSFC's proposal that the loan be procured. Despite testimony of Barbre and Chance that CSFC promised a 1 million dollar line of credit which it then cut off at $600,000, there is no writing to evidence such an agreement. Debt memoranda in the record disclose that with respect to the Nestler, Mastercraft, and Redfield accounts, payments were three or more months overdue at the time of the chargebacks. A memorandum in the record shows that Chance indicated his consent to the Mastercraft chargebacks. Barbre, as Delta's president, signed the inventory reporting service agreement with CSFC and Collateral Control Corporation and also signed the agreement setting up the No. 2 factoring account and an agreement giving CSFC a security interest in Delta's inventory to secure payments under the No. 2 account.

We conclude from our consideration of the entire record that not only were the chargebacks authorized by the language of the factoring agreements, but they were such actions as prudence would dictate be taken with respect to a factoring arrangement with an ailing company. All actions were exercised so as to lessen the obligations of the sureties; indeed, had the factoring accounts been handled less stringently, the deficiency sued for might have been more. We are particularly mindful that at all times, Chance and Barbre, as officers of

Delta, submitted to, acquiesced in, and worked closely with CSFC in implementing the latter's measures. For these reasons, we cannot find in the evidence of the overall history outlined above, that by mistakes in one or two areas, CSNB, through CSFC, was exercising bad faith or attempting to close down Delta. No one is required to exercise perfect business judgment and there is nothing here to show bad faith.

An accounts receivable factor is governed by its contractual agreements and, to the extent applicable, the provisions of Title 9 of the Uniform Commercial Code. *C C Financial v. Ross*, 250 Ga. 832, 833 (1) (301 SE2d 262) (1983). Presupposing the applicability here of OCGA § 11-1-203, which " 'in effect states that what is not regulated by the contract should be done in such a way as to show good faith in the carrying out of what is expressed' . . . [Cit.]," *Fulton Nat. Bank v. Willis Denney Ford*, 154 Ga. App. 846, 848-849 (269 SE2d 916) (1980), we see no issues of bad faith to submit to a jury. The trial court erred in denying CSNB summary judgment against cross-appellees' bad faith discharge defense. See generally *First Bank of Savannah v. Kilpatrick-Smith &c. Co.*, 153 Ga. App. 112, 113 (2)-114 (264 SE2d 576) (1980); *Custom Panel v. Bank of Hampton*, 143 Ga. App. 681, 682 (1)-683 (239 SE2d 558) (1977).

b. The basis for cross-appellees' discharge defense based on fraud is outlined in the following allegation from their answers:

"Prior to December 1, 1976, the date of the first [loan] Agreement, plaintiff [CSNB] and CSFC had determined that they were likely to sustain losses on Delta obligations and unknown to Delta and defendant[s], embarked upon a scheme pursuant to which Delta obtained this loan guaranteed by Farmers Home Administration in the amount of $4,000,000, subsequently increased by an additional $600,000, the effect of which was to enable plaintiff and CSFC immediately to collect more than $3,000,000. Plaintiff and CSFC fraudulently induced Delta to enter into the loans by concealing the fact that they did not intend in good faith to support financially Delta and that they intended to terminate the lending relationship with Delta as soon as they could do so."

We find no evidence in the record that CSNB and CSFC conspired to defraud Delta or its sureties, cross-appellees. Further, there is no confidential relationship between a bank and its customers borrowing funds. *Citizens &c. Nat. Bank v. Arnold*, 240 Ga. 200, 201 (240 SE2d 3) (1977); *Boatman v. Citizens &c. Nat. Bank*, 155 Ga. App. 848, 850 (273 SE2d 190) (1980); *Limoli v. First Ga. Bank*, 147 Ga. App. 755, 757-758 (250 SE2d 155) (1978). Absent a confidential relationship, cross-appellees have no basis on which to assert reasonable reliance on the alleged misrepresentations. See *Citizens Bank v. Bowen*, 169 Ga. App. 896 (315 SE2d 437) (1984). Barbre and Chance as officers of Delta had "an equal, if not greater opportunity" to know

whether CSFC was likely to sustain losses on Delta obligations, having access to the same information on Delta's financial status as CSFC. *Gen. Motors Acceptance Corp. v. Bowen Motors*, 167 Ga. App. 463, 466 (306 SE2d 675) (1983). See *Arnold*, supra at 202.

Mrs. Chance and Mrs. Barbre, who had no financial interest in Delta and no dealings with CSFC, stated in their affidavits that they signed the surety agreements because their husbands asked them to. Thus, there was neither reasonable reliance nor due diligence, on the parts of the wives. *Bowen Motors*, supra at 467.

The trial court erred in denying summary judgment to CSNB on the issue of discharge by fraud.

*Judgment affirmed in Case No. 67551. Judgment reversed in Case No. 67552. McMurray, C. J., and Deen, P. J., concur.*

DECIDED JUNE 20, 1984 —
REHEARING DENIED JULY 16, 1984 — 

*John M. Sikes, Jr., Stephen M. Forte*, for appellants.
*M. Kathryn O'Shields, Jerry B. Blackstock, Randall L. Hughes*, for appellee.