1999 SD 126

Clifford **BUXCEL** and Elaine Buxcel,
Plaintiffs and Appellants,

v.

**FIRST FIDELITY BANK**, Defendant
and Appellee.

and

Small Business Administration,
Defendant.

No. 20355.

Supreme Court of South Dakota.

Considered on Briefs Oct. 20, 1998.

Reassigned June 21, 1999.

Decided Sept. 15, 1999.

Rehearing Denied Nov. 22, 1999.

James E. Carlon, Pierre, SD, for plaintiffs and appellants.

Brent A. Wilbur of May, Adam, Gerdes & Thompson, Pierre, SD, for defendant and appellee.

AMUNDSON, Justice (on reassignment).

[¶ 1.] When Buxcels were looking for a business to buy, First Fidelity Bank encouraged them to purchase a grocery store from its customers, the Fabers. A bank officer told them they could earn "a good living" in the business. Buxcels bought the store, pledging their farm and home as collateral. First Fidelity financed the purchase and prepared the SBA guaranteed loan application. After the store failed, Buxcels learned that First Fidelity knew Fabers had chronic cash flow problems and that the bank had threatened foreclosure. Buxcels brought suit, asserting that First Fidelity misrepresented the condition of the business, breached a fiduciary duty owed to them, and failed to disclose Fabers' distressed financial condition. The trial court ruled as a matter of law that no fiduciary duty existed and instructed the jury that the bank owed no duty to disclose. On the remaining claims, the jury returned a verdict in favor of First Fidelity. Buxcels appeal, asserting that the bank owed them a fiduciary obligation and had a duty to disclose the previous owners' lending history. We reverse and remand.

## FACTS

[¶ 2.] Clifford and Elaine Buxcel resided on their family farm, northwest of Murdo, South Dakota. In 1990, after enrolling their family farm in the Conservation Reserve Program, they sought ways to make additional income. First Fidelity's loan officer and realtor, Brian O'Reilly, told them that Dean's Market, a grocery store located on Main Street in Murdo was for sale. The market was owned by Dean and Betty Faber. While there was no sign or other indication that the market was for sale, O'Reilly indicated that First Fidelity, which is also a real estate agency, had a listing for the market. Buxcels expressed interest. O'Reilly referred Buxcels to First Fidelity's Senior Vice–President and manager of the Murdo branch, D.J. Mertens.

[¶ 3.] Mertens met with Buxcels at the bank to discuss the purchase. Mertens discussed gross sales and receipts of the market's operation with Buxcels. Later

meetings followed, during which Buxcels were assured by Mertens and Betty Faber that they could make a "good living" from the store if they "worked hard." They were also told that Fabers wanted to "retire from the business." Mertens indicated that he would assist Buxcels and that First Fidelity would finance the purchase of the loan. Mertens provided an acquisition and financing package to Buxcels. The package included an offer and purchase agreement, an appraisal, cash flow, and SBA application, which was previously prepared for prior prospective purchasers. Mertens advised Buxcels to obtain a SBA loan for the purchase of the market. An SBA loan allows First Fidelity to safeguard its risk by guaranteeing repayment of ninety percent of the loan to First Fidelity in the event of default. As a condition of financing, First Fidelity required that Buxcels grant a second mortgage on their 1700-acre farm and homestead. First Fidelity financed both the purchase price ($80,000 plus inventory of approximately $40,000) and the beginning operating expenses.

[¶ 4.] At no time did anyone intimate to Buxcels that Fabers held a loan with First Fidelity. Further, there was never any indication that the store was heavily indebted, that Fabers had a long-term record of poor performance on payments, and that First Fidelity wanted to sell the market, rather than pursuing foreclosure, which would have resulted in piece-by-piece liquidation.

[¶ 5.] Following discussions advising Buxcels to obtain a SBA loan, Mertens gathered the necessary information and prepared the SBA loan application for Buxcels. The application included an internal appraisal of the store, valuing it at $160,000. Mertens also compiled figures for the loan application that showed the store could make money, based on reports from the grocery's food supplier, Affiliated Foods. Further, the report provides that Fabers were selling the market because

they desired to retire. Buxcels signed the application form.

[¶ 6.] Following the purchase of the market, Buxcels eagerly went to work making improvements on the store. They cleaned and reorganized the store, put on a new roof, and improved its overall appearance.

[¶ 7.] Notwithstanding these improvements, within only a few months the business was in serious financial trouble. Revenues were inadequate to cover expenses. Over this time, First Fidelity advanced $45,000 in additional loans to Buxcels. Eventually, Buxcels were put on a cash-only basis with their food supplier, Affiliated Foods, and First Fidelity began to return Buxcels' checks. Buxcels ultimately defaulted on their loan payments.

[¶ 8.] First Fidelity made a demand on the SBA for payment of the ninety-percent guarantee and turned servicing the loan over to the SBA. Upon foreclosure, SBA determined the fair market value of the store to be $41,000. Assuming the bank's appraised value of $160,000 was accurate, this reflects a $119,000 drop in fair market value of the market in this short period of time.

[¶ 9.] Buxcels sued First Fidelity, claiming that it intentionally failed to disclose the complete and troubled financial history of the market. During discovery, Buxcels obtained Fabers' personal loan file at First Fidelity and learned that the business had substantial debts which were not being paid.

[¶ 10.] The loan comment sheets indicate the market under Fabers' operation was severely indebted. In 1978, Fabers borrowed $3,000 to cover cash flow short falls. From April of 1978 to May of 1983, Fabers borrowed an additional $47,000 to cover cash shortfalls. By March of 1986, Fabers were writing checks with insufficient funds and were discussing their cash flow problems with First Fidelity. In April of 1987, Fabers' borrowing increased to $66,000. By December of 1988, Fabers' borrowing was in excess of $82,000 and the comment

sheet states that Mertens "discussed his financial situation and the fact that he was falling behind." In June of 1988, Mertens met with Fabers and discussed the note, which was past due and the fact that he "was behind again." First Fidelity continued with Fabers' loan, rewriting the loans into one note. As of July 1988, Fabers loan was now up to $104,000. By February of 1991, liquidation of the store's assets was discussed with Fabers, who indicated they would attempt to sell the business. In February of 1991, Fabers were again forced to borrow more money. During this period of time, First Fidelity started returning checks on the market "because they had run behind." In March 1991, Fabers injected $17,000 of their own money into the business and First Fidelity agreed to lend another $10,000 to keep the store open.

[¶ 11.] At trial, over Buxcels' objection, the jury was instructed that First Fidelity had no duty to disclose Fabers' financial information to Buxcels before the sale of the store, absent subpoena, court order, or the consent of Fabers. Further, the trial court granted First Fidelity's motion for a directed verdict on Buxcels' breach of fiduciary duty claim, determining as a matter of law no fiduciary duty was created.

[¶ 12.] Buxcels appeal, claiming the trial court erred in granting a directed verdict in favor of First Fidelity on the breach of fiduciary duty claim and in failing to give an instruction that First Fidelity had no duty to disclose customer loan records.

### STANDARD OF REVIEW

[¶ 13.] We review asserted failure to give instructions under the following standard:

> On issues supported by competent evidence in the record, the trial court should instruct the jury. The trial court is not required to instruct on issues lacking support in the record. Failure to give a requested instruction that correctly sets forth the law is prejudicial error. Jury instructions are reviewed

as a whole and are sufficient if they correctly state the law and inform the jury. Error is not reversible unless it is prejudicial. The burden of demonstrating prejudice in failure to give a proposed instruction is on the party contending error.

*Sundt Corp. v. South Dakota Dep't. of Transp.*, 1997 SD 91, ¶ 19, 566 N.W.2d 476, 480 (emphasis added) (citing *Kuper v. Lincoln–Union Elec. Co.*, 1996 SD 145, ¶ 32, 557 N.W.2d 748, 758). We review an order granting a directed verdict under SDCL 15–6–50(a) as a question of law. A directed verdict motion questions the legal sufficiency of the evidence to sustain a verdict against the moving party. On such a motion, the court must determine whether, viewing the evidence most favorable to the nonmoving party, there is any substantial evidence to sustain the action. If reasonable minds might differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and we will not seek reasons to reverse. *Schuldies v. Millar*, 1996 SD 120, ¶ 8, 555 N.W.2d 90, 94–95 (citations omitted). The existence and scope of a fiduciary duty are questions of law. *High Plains Genetics Research, Inc. v. JK Mill–Iron Ranch*, 535 N.W.2d 839, 842 (S.D.1995) (citations omitted). Whether a breach of a fiduciary duty occurred, however, is a question of fact. *Id.*

### DECISION

[¶ 14.] The trial court erred in failing to instruct the jury that First Fidelity had a duty to disclose under the facts of this case. While as a general rule, one party to a transaction has no duty to disclose material facts to the other, "special circumstances" may dictate otherwise. *Klein v. First Edina National Bank*, 293 Minn. 418, 196 N.W.2d 619, 622 (1972). One example of such a "special circumstance" is:

> One who stands in a confidential or fiduciary relation to the other party to a

transaction must disclose material facts. (Citation omitted.)

*Id.* A confidential "relationship is not restricted to any particular association of persons. It exists whenever there is trust and confidence, regardless of its origin." *Brandriet v. Norwest Bank,* 499 N.W.2d 613, 617 (S.D.1993) (citing *Hyde v. Hyde,* 78 S.D. 176, 186, 99 N.W.2d 788, 793 (S.D. 1959)). "A confidential relationship is generally synonymous with a fiduciary relationship." *Crane v. Centerre Bank of Columbia,* 691 S.W.2d 423, 428 (Mo.App. 1985) (citation omitted). A " 'disparity of business experience and invited confidence' are a basis for finding such a [fiduciary] relationship." *May v. First Nat'l. Bank of Grand Forks,* 427 N.W.2d 285, 290 (1988) (quoting *Murphy v. Country House, Inc.,* 307 Minn. 344, 240 N.W.2d 507, 512 (1976)). Special circumstances exist under the facts of this case, creating a confidential or fiduciary duty on the part of First Fidelity to disclose the true picture of the history of this grocery store business. As it stands, First Fidelity was less than candid with Buxcels by providing projections prepared for the SBA that the store was a viable business when, in fact, the business was in serious financial trouble.

[¶ 15.] The records of First Fidelity regarding Fabers' loan history show an indebtedness starting at $3,000 on April 12, 1978, which increased to $116,026.05 on May 26, 1992, with a charge off of $22,-000.00 (actual $163,304.97). During this fourteen-year period, First Fidelity's records disclose that new loans were made to Fabers so that interest would be paid and the unpaid principal would be rewritten into a new note. A note in the bank's comment sheet on June 16, 1989, states as follows:

We called Dean into the office this date and again discussed his performance on his note and his checking account. We stated that regardless of our efforts *to turn his business around,* that things have remained the same and he is continuing to go backwards. We then informed him that because of the continued escalation of his debt that we are no longer continued [sic] to finance his business operation and that he should make arrangements to pay the bank in full. After some discussion, it was decided that he would seek refinancing for his current obligations with this Bank with another bank. (Emphasis added.)

Then, on March 1, 1991, after no refinancing had been obtained, the comment sheet states in relevant part:

At this point in time, we have been returning checks on Dean's market because they have run behind. Most of these checks have been returned back to their suppliers. Over the past couple of weeks, the amount of their outstanding checks has been declining and that there is progress, but to date, the warehouse was going to notify the Fabers that they could no longer supply them with products. *In essence, this would close their doors* and at this point in time, we [bank] would have been involved in a piece by piece liquidation of the business. I did feel *that it would not be in the Bank's best interest* at this given point in time to conduct this type of liquidation but to continue to work for a turnkey sale [of] the business to an individual. (Emphasis added.)

[¶ 16.] That individual arrived, namely Clifford and Elaine Buxcel, whose only business experience came from toiling long hours on a farming/ranching operation. First Fidelity was generous enough to assist Buxcels in obtaining a $160,000 SBA loan for the purchase of this thriving grocery store. Not surprisingly, within months, Buxcels were having cash flow problems and were subsequently foreclosed upon.

[¶ 17.] From that very first time Mertens met with Buxcels at the bank, First Fidelity assumed an active role and was integrally involved in the sale of this gro-

cery store.[1] All of the meetings took place at the bank. At the first meeting, Mertens discussed the purchase of the store with Buxcels, providing the store's gross sales and receipts. Subsequently, Mertens presented to Buxcels an acquisition and financing package, which consisted of an offer and agreement, appraisal, cash flow, and SBA application. First Fidelity then obtained the requisite information and prepared the SBA application and processed the SBA loan for Buxcels. Prior to signing the SBA application, Mertens told Buxcels he thought the business "would work."

[¶ 18.] Obviously, obtaining an SBA loan was in the best interest of First Fidelity, its directors, and shareholders, considering where the bank was situated with regard to the Fabers' loan prior to the sale of the store to Buxcels. First Fidelity had written off the Faber loan as a loss, until Buxcels, with the backing of the SBA, bailed them out. Mertens' testimony at trial reflected the impossibility of realizing a return on the Faber loan prior to the sale to Buxcels.[2]

[¶ 19.] In *Brandriet*, 499 N.W.2d at 618, this Court held that a confidential relationship existed between the bank and its customer in the processing of a VA loan. This Court stated:

> Brandriets placed their trust and confidence in Norwest to process the VA loan; Norwest officials were supposed to be acting with the Brandriets' interest in mind. Where such an exchange of trust and action exists, a confidential relationship also exists. *Schwartzle v. Dale*, 74 SD 467, 471, 54 N.W.2d 361, 363 (1952).

*Id.* If a confidential and trusting relationship existed in the processing of a VA loan, similarly, it can exist when processing a SBA loan. If a bank is to act with the customer's interest in mind when processing a VA loan, the same should be the case when processing a SBA loan. Similar to the Brandriets, Buxcels were invited to place their trust and confidence in First Fidelity to process the SBA loan. As a result, a confidential relationship existed between the parties.[3]

---

1. Mertens testified at trial:

   I had financed grocery stores in the past and I know a little bit about grocery stores and I have a little lingo I start out with: that an operation of a grocery store is awfully hard business; that you order the supplies, you unload them from the truck, you put them on the shelf, and you haul them back out. It's hard work and you have to deal with complaints with the sour milk and, you know, and that.

   I also because I've worked with Affiliated Foods, explained to them or told them about the Affiliated Food programs that – that they have available. And I always felt very comfortable with Affiliated's ability to train and to teach people the store business.

   And I related back to them some of the stores that I have worked with. One of the stores I financed a guy worked on the streets, you know, for the city of Kennebec and ended up being very successful in the business.

   And I also suggested they go over and visit that store in Kennebec. And I also suggested that I understand that Affiliated store in Kadoka is an outstanding store and a high profit store and to go and visit that store.

2. Q: When you obtained an SBA loan guarantee the bank has less risk, doesn't it?
   A: Yes.
   Q: If the loan goes into default you can get 90 [ninety] percent of your money by just making a demand on the SBA, can't you?
   A: Yes.
   Q: They're a pretty reliable payer?
   A: Yes, they are.
   Q: Much more difficult to get that money out of a loan customer at the bank?
   A: Yes.
   Q: If you would have to try to get the money out of the Fabers it would have been much more difficult?
   A: Yes.
   Q: You probably wouldn't have gotten ninety percent of your $180,000?
   A: I've never had that happen yet.

3. The bank's involvement is clearly set forth in a letter written to James Berry of the Small Business Administration by the bank on behalf of securing a SBA loan for Buxcels. The letter states in part:

   The current owners of the store have lost interest in the business and the store needs to be rearranged, plus it needs a good cleaning. ... I do believe with proper management, this store has potential.

[¶ 20.] First Fidelity orchestrated the sale of this grocery store from the very first meeting between Mertens and Buxcels. Mertens prepared the offer and purchase agreement and appraisal, and provided cash flow information and the SBA application. Buxcels relied upon the appraisal[4] provided as to the fair market value of the store and did not negotiate the price. All of the while, First Fidelity failed to inform Buxcels of the loan it held with the Fabers and the interest the bank possessed in regard to the sale of the store. Further, First Fidelity stated the reason for the sale was retirement, when in truth, the store was heavily indebted and would be liquidated unless a buyer could be found. Buxcels clearly placed their trust and confidence in First Fidelity. They relied on Mertens and believed he was representing their interest. Under such circumstances, a duty to disclose arose.

[¶ 21.] In searching for the truth in a jury trial, the jury should have been instructed on the fiduciary duty to disclose. Would a bank, for example, in Pierre, have loaned Buxcels $160,000 to purchase this grocery store business, knowing the store's dismal financial history? The answer is a resounding "No." Why? Because it would simply not be in the best interest of a bank's directors and stockholders. Another bank did not have the vested interest that First Fidelity held in this transaction. First Fidelity knew this ship was going down and they brought Buxcels aboard, along with their other assets (the second mortgage on their 1700–acre farm and homestead), to go down with it.

[¶ 22.] A review of this record shows what Buxcels actually purchased was a one-way ticket to bankruptcy court. Without a disclosure, First Fidelity was able to reduce their exposure in this business loan from one hundred percent to ten percent, thanks to the SBA.

[¶ 23.] We reverse and remand for a fair trial, allowing the jury to be instructed on the duty to disclose. Presented with the entire picture, the jury can then determine whether the failed business venture was due to Buxcels' management of the market.

[¶ 24.] MILLER, Chief Justice, concurs.

[¶ 25.] SABERS, Justice, concurs specially.

[¶ 26.] KONENKAMP and GILBERTSON, Justices, dissent.

SABERS, Justice (concurring specially).

[¶ 27.] I write specially to take issue with the dissent which, although very well written, clearly misses the mark. It would approve a rule which would allow the bank, as an inadequately secured creditor, to foist its debts upon the people of the United States, through the federal government (SBA), and upon an unsuspecting, trusting couple with a ranch for collateral. The bank did this through its officer, agent and realtor, who knew the crucial details of the delinquent business. The evidence indicates that this bank officer knew that these "investors" would not and could not succeed and yet, never disclosed the real conflict of interest, the self dealing on the part of the bank, or the crucial financial details.

[¶ 28.] The rule proposed by the dissent would result in a "license to steal" for the bank and ignores the law that officers,

---

Comparing this letter to bank's comment sheet, it is no mystery why the Fabers lost interest in the business—bank had ceased lending money and the food supplier had stopped shipments. Further, do these comments reflect a store that has potential? I dare say not. In shepherding this SBA loan application, bank clearly acted on behalf of Buxcels and certainly invited reliance by Buxcels. A duty to disclose arose when this bank negotiated an SBA loan for this prospective buyer of this sunken ship, also known as a grocery store.

4. The appraisal done by bank valued the store at $160,000, the appraisal by the SBA following foreclosure, valued the same store at $41,-000.

agents and realtors have a fiduciary duty to disclose under these circumstances. The dissent concedes that this bank "took an uncommonly active role in the sale" but attempts to excuse the same because it was a "rural bank." Nonsense. The rules are the same for rural and urban banks and realtors. This "rural bank" could have arranged for the debtors to hire an independent realtor rather than use its own officer, agent and realtor to sell the property.

[¶ 29.] I also take issue with the dissent's prediction of the dire consequences from the holding in this case. Even if the dissent were to be right on this "inevitable" "chorus" of lawsuits, I submit the best practice, in both the short and long run, is to follow the law as done in this case.

[¶ 30.] As further support of the above and the duty to disclose, I submit the following quote from our recent case, *Dinsmore v. Piper Jaffray, Inc.*, 1999 SD 56, 593 N.W.2d 41:

> After careful review of South Dakota law, we hold that the district court's decision to instruct the jury that a fiduciary relationship exists between brokers and their customers was not fundamentally deficient in analysis or otherwise lacking in reasoned authority. Eighty years ago, the South Dakota Supreme Court held that real estate brokers owe a fiduciary duty to their clients. The court held as follows:
>
> > The relation of an agent to his principal is ordinarily that of a fiduciary, and, as such, it is his duty to act with entire good faith and loyalty for the furtherance and advancement of the interest of the interest of his principal in all dealings or affecting the subject-matter of his agency. And this rule is just as applicable to an agent whose duty it is to find a purchaser for the real estate of his principal as any other. Such an agent owes to his principal the obligation of securing for the principal the highest price he can obtain for such property.

*Durand v. Preston*, 26 S.D. 222, 128 N.W. 129, 131 (1910) (citation omitted). The South Dakota Supreme Court recently reaffirmed that the relationship between a real estate broker and his or her clients is a fiduciary one, holding that the broker owes clients 'a duty of utmost good faith, integrity, and loyalty.' *Hurney v. Locke*, 308 N.W.2d 764, 768 (S.D.1981). The *Hurney* court reasoned that a fiduciary duty should be imposed on real estate agents or brokers because '[a] real estate agent is a licensed professional holding himself out as trained and experienced to render a specialized service. Clients rely on the agent's expertise and expect the agent to act in their best interests.' *Id.* (citation omitted). Likewise, securities brokers such as Marks and Ulrich at Merrill Lynch are 'licensed professional[s] holding [themselves] out as trained and experienced to render a specialized service.' *Id.* Like the clients of real estate agents, securities customers 'rely on the agent's expertise and expect the agent to act in their best interests.' *Id.* Because we see no significant difference between real estate brokers and securities brokers, we believe that if confronted with the question, the South Dakota Supreme Court would find that securities brokers are fiduciaries that owe their customers 'a duty of utmost good faith, integrity and loyalty.' *Id.*

*Dinsmore*, 1999 SD 56, ¶ 18, 593 N.W.2d at 46 (quoting Davis v. Merrill Lynch, Pierce, Fenner, and Smith, 906 F.2d 1206, 1215 (8th Cir.1990)).

[¶ 31.] Therefore, I join Justice Amundson's writing to reverse and remand for a fair trial.

KONENKAMP, Justice (dissenting).

[¶ 32.] Were it not for settled law, I would be drawn to join the majority, for its decision touches a gallant chord. Not that the majority disregards the law—instead, it broadly expands the rules on fiduciary

duties. In doing so, it reaches almost operatic expediency. Formidable obstacles fall away and unexpected forces achieve a climactic rescue. To fulfil this triumph, the bank transforms unwittingly into a trustee for its borrowers, customer confidentiality vanishes, and twelve jurors, who found no fault in the bank's conduct, are banished with their verdict to make way for the majority's new benevolence. As Justice Hugo Black once remarked, "the holding in this case today makes it more necessary than ever that we stop and look more closely at where we are going." [5]

[¶ 33.] To look where we are going, let us begin by confirming that, at least until today, not every bad loan and business misfortune creates an occasion for a new fiduciary duty. And however much one may question First Fidelity's involvement in this sale, the jury, after hearing all the pejoratives the majority now dwells on, still rejected the Buxcels' claims for fraud, misrepresentation, negligence, and breach of the implied covenant of good faith and fair dealing. In this appeal, no one claims that the instructions defining those causes of action were defective. What is more, the jury had in hand the bank records the majority says the Buxcels should have had before making their purchase decision. Nevertheless, the jurors were unconvinced. We are thus to decide only if the bank had some distinct obligation to disclose to the Buxcels its financial data about the Fabers.

[¶ 34.] No rule cited to us imposes on banks a general duty to disclose to its customers information about its other customers. As I see it, then, and as counsel argues the matter, any such duty must arise from some special connection beyond ordinary debtor-creditor relations. The majority finds such a connection by extending the fiduciary duty concept beyond rational limits. Yet "[t]he virtually unanimous rule is that creditor-debtor relation-

ships rarely give rise to a fiduciary duty." *United Jersey Bank v. Kensey*, 306 N.J.Super. 540, 704 A.2d 38, 44 (N.J.Super.Ct.App.Div.1997) (citations omitted).

[¶ 35.] This Court now holds that a bank must voluntarily disclose to a borrower unrequested financial data on another borrower. Bank customers are shielded from undue government intrusion through the Bank Secrecy Act and the Right to Financial Privacy Act. *See* 31 U.S.C.A. § 5313 and 12 U.S.C. § 3403(c). But after today, no law will apparently protect customers in South Dakota if, to avoid a lawsuit, a bank decides to reveal a customer's financial secrets to another customer. In its haste to heave the curtain, the majority brooks no legal impediment. Many jurisdictions, however, hold banks to an implied contractual duty to keep financial information about borrowers confidential. *See* Edward L. Raymond, Jr., J.D., Annotation, *Bank's Liability, Under State Law, For Disclosing Financial Information Concerning Depositor or Customer*, 81 A.L.R.4th 377 (1990); *see also Peoples Bank of Virgin Is. v. Figueroa*, 559 F.2d 914, 917 (3dCir.1977) (bank could not make unauthorized disclosure of customer's financial information "without breaching duties of confidentiality and privacy"); *Roth v. First Nat'l. State Bank of New Jersey*, 169 N.J.Super. 280, 404 A.2d 1182, 1184 (1979), *cert. denied*, 81 N.J. 338, 407 A.2d 1212 (1979) (stating "there is a generally recognized obligation of confidentiality in respect of a depositor's financial relationship with a bank."); *In re Addonizio*, 53 N.J. 107, 248 A.2d 531, 546 (N.J.1968) (bank may have contractual obligation to keep customer transactions confidential, but must comply with subpoena); Roy Elbert Huhs, Jr., *To Disclose or Not to Disclose Customer Records*, 108 Banking LJ 30 (1991) (analyzing banks' duty to maintain confidentiality of customer records and the "special circumstances" that create a duty to disclose); Raymond, *su-*

---

**5.** *Brown v. Louisiana*, 383 U.S. 131, 168, 86 S.Ct. 719, 737, 15 L.Ed.2d 637, 660 (1966) (Black, J., dissenting).

*pra* (discussing information disclosure by banks). Here, First Fidelity had a written confidentiality policy covering its customer records. A bank can usually divulge confidential data only when a customer consents or when the law requires disclosure. *Id.; see also Baldwin v. First Nat'l. Bank of Black Hills,* 362 N.W.2d 85 (S.D.1985) (no invasion of privacy when petitioner consented to disclosure).

[¶ 36.] Ordinarily, a lender-borrower relationship presupposes an arm's length transaction, as each side works in its own interest. *See Taggart v. Ford Motor Credit Co.,* 462 N.W.2d 493, 499 (S.D.1990) ("This court has never imposed a duty to disclose information on parties to an arm's-length business transaction, absent an employment or fiduciary relationship."). Because their positions conflict, it "would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table." *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 53 (3dCir.1988) (quoting *Weinberger v. Kendrick,* 698 F.2d 61, 79 (2dCir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

[¶ 37.] Essential to recognizing a fiduciary duty requiring a bank to reveal private information is a finding that to not do so would be a gross breach of good faith and fair dealing, amounting to deceit. *See Barnett Bank of West Florida v. Hooper,* 498 So.2d 923 (Fla.1986) (bank officer knew that customer was engaged in check kiting scheme but still encouraged another customer to borrow and place funds with the malfeasant); *Capital Bank v. MVB, Inc.,* 644 So.2d 515 (Fla.Dist.Ct.App.1994) (when bank has assumed a fiduciary role, the responsibilities that accompany that role follow). In analyzing those unusual cases where banks are obligated to disclose customer data, the court in *United Jersey Bank* stated:

> These cases all involved egregious breaches of the lender's duty of good faith and fair dealing. In each of these cases, the bank actively encouraged the plaintiff to rely upon its advice and concealed its self-interest in promoting the transaction involved. In blunt terms, the banks acted no better than common swindlers.

*United Jersey Bank,* 704 A.2d at 46. *Cf. Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 401 (Minn.1996) (bank's "knowledge of a customer's irretrievable insolvency" creates duty to disclose such information to third-party customers contemplating loan transactions involving the irretrievably insolvent party). As recognized in the Restatement (Second) of Torts § 551 (1977 & Supp. 1997), in certain rare instances there may be a duty to disclose. Comment 1 to § 551, subsection 2, explains that the circumstances contemplated under this rule occur when the advantage taken of a plaintiff's ignorance is "so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling...."

[¶ 38.] In deciding whether a bank owes a fiduciary duty we look to our seminal case on the subject, *Garrett v. BankWest, Inc.,* 459 N.W.2d 833 (S.D.1990). In *Garrett,* we stated:

> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*

*Id.* at 837–38 (emphasis in original) (citations omitted). We also noted:

> [A] relationship can become a fiduciary relationship if the borrower reposes a faith, confidence and trust in the bank which results in dominion, control or influence over the borrower's affairs.... [T]he borrower who reposes the confidence must be in a position of "inequali-

ty, dependence, weakness or lack of knowledge."

*Id.* at 838 (quoting *Union State Bank v. Woell,* 434 N.W.2d 712, 721 (N.D.1989)). In ordinary lender-borrower relations, therefore, no fiduciary duty exists. *Id.* at 838. Other jurisdictions have held the same. *See, e.g., Delta Diversified, Inc. v. Citizens & S. Nat'l Bank,* 171 Ga.App. 625, 320 S.E.2d 767, 776 (1984) (noting that "there is no confidential relationship between a bank and its customers borrowing funds"). To discern a fiduciary duty, a court must find three things: (1) the borrower reposed "faith, confidence and trust" in the lender, (2) the borrower was in a position of "inequality, dependence, weakness, or lack of knowledge" and, (3) the lender exercised "dominion, control or influence" over the borrower's affairs. *Garrett,* 459 N.W.2d at 838 (citing *Union State Bank,* 434 N.W.2d at 721); *see also Waddell v. Dewey County Bank,* 471 N.W.2d 591, 593–94 (S.D.1991) (reciting the necessary elements to establish a fiduciary duty between borrower and bank).

[¶ 39.] Applying the *Garrett* factors, no fiduciary relationship existed here. First, although the Buxcels claim they expected the bank to give them accurate, complete information on the store, that reliance was misplaced. Banks are commercial enterprises in business to make a profit. They owe their primary allegiance to their directors and stockholders. Of course, they also owe a duty of good faith and fair dealing to their customers. They cannot misrepresent the truth. From the jury's verdict we know the bank did not misrepresent facts or breach its duty of good faith and fair dealing. Banks are not placed in a fiduciary relationship simply because they have at hand information that might give a potential borrower pause before proceeding. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874 cmt. a (1979).

[¶ 40.] Second, the Buxcels insist that because they had no knowledge of how to fill out SBA loan papers, had no retail sales or management experience, and had limited educations, they were in an uneven bargaining posture and in a position of inequality, dependence, weakness, and lack of knowledge. Before the sale, the bank suggested to the Buxcels that they visit other grocers to learn about the business. It also recommended that they examine the Fabers' books and independently investigate the store and its operations. To establish a fiduciary duty, it must be shown that the relationship decreased the dependent party's ability or willingness to act on its own behalf. *Ainsworth v. First Bank of South Dakota,* 472 N.W.2d 786, 788 (S.D.1991)("There must be additional circumstances, or a relationship that induces the trusting party to relax the care and vigilance which he would ordinarily exercise for his own protection."). The bank did not induce the Buxcels to relax their vigilance. The bank encouraged them to visit other grocery stores to understand the business. They never did. They were given unlimited time to review the books before buying Dean's Market. At trial, Clifford Buxcel admitted that despite having looked at the books he did not understand them, but planned to gain an understanding after buying the grocery. The Buxcels declined to obtain an independent appraisal, to hire an attorney, or to consult with an accountant. The bank did not induce them to neglect these things; the Buxcels, on their own, failed to do what most prudent business purchasers would do.

[¶ 41.] Third, even if we were to recognize a plausible showing on the first two factors, the Buxcels must also establish that the bank exercised dominion, control and influence over their affairs. "Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other." *High Plains Ge-*

*netics Research, Inc.*, 535 N.W.2d at 842. Where has this been shown? Although they borrowed minor sums from the bank in the past, there was nothing to suggest a dependent or controlling financial relationship. The Buxcels had no reason to feel compelled to buy the store, to borrow money from First Fidelity, or to resort to the bank's loan officer for advice or information. Initially, they intended not to buy the grocery, then changed their minds. The Buxcels ignored the bank's suggestions for investigating the business. When the Buxcels were actually running the store, they disregarded suggestions to obtain outside help to increase profits from their food distributor and other sources, even though help was available. The bank did not exercise dominion or control over their affairs, before or after the sale.

[¶ 42.] During trial, moreover, the bank offered considerable evidence that the Buxcels' business venture failed through their mismanagement. After the sale closed, the Buxcels put a new roof on the store, cleaned it, and improved its overall appearance. Unfortunately, though, they eliminated or changed some of the grocery's more profitable attractions. They stopped making homemade pizza, discontinued stocking meat at the beginning of every week, quit selling a profitable line of personal products, refused to cash checks, and declined to arrange inventory in a manner recommended by their supplier to maximize profits. Indeed, they failed to gross nearly as much as the Fabers had. Furthermore, whether the Fabers' financial difficulties were the result of their own excessive draws, as opposed to some intrinsic deficiency in the store as a profitable business, was a factual point in dispute at trial. Mertens testified that the Fabers lived above their means, pulling more money out of the market than the business could bear.

[¶ 43.] First Fidelity may have had a keen financial interest in protecting its existing loans and in promoting new ones, but that will not make it an insurer or a trustee for its borrowers. I concede the bank took an uncommonly active role in the sale, but according to expert testimony from an official with the SBA, much of which the jury must have accepted, such role is not unusual for rural banks in South Dakota. Consequently, the Buxcels failed to show that it was error to instruct the jury that the bank had no duty to disclose the Fabers' personal loan information.

[¶ 44.] Contrast this case with *Brandriet*, 499 N.W.2d 613, cited by the majority. There, the bank admittedly positioned itself in an "advocacy role" for its customers, the Brandriets. *Id.* at 618. A bank officer, claiming she was "working for the Brandriets," represented herself to them as an expert on VA loans, and falsely informed them that they were ruled ineligible for such a loan. *Id.* Confronted with the bank's "blatant misrepresentations," another bank officer conceded in testimony that "the bank owed a duty to the Brandriets." *Id.* Under "these facts and circumstances," we affirmed the trial court's legal conclusion that a confidential relationship developed. *Id.* This Court went on to hold that the Brandriets proved their claim of "fraud," which was "willful, wanton and malicious." *Id.*

[¶ 45.] Here, oppositely, the jury found that the Buxcels' proved no fraud, no misrepresentation, no negligence, and no breach of good faith and fair dealing. As those findings were not appealed, they stand final and unassailable, despite the majority's attempted reprise in its assertion that the bank "was less than candid with" the Buxcels. Unlike *Brandriet,* the bank here never conceded that it was acting for the Buxcels in the grocery store sale, and nothing in the record supports any finding that the bank represented itself to them as a grocery business expert working for their benefit. True, the bank prepared the SBA loan documents for them, but that was *after* the Buxcels decided to purchase the business. If the Buxcels reposed unreserved trust in the bank, it was done unilaterally, without the bank's

acceptance of such trust. Quite the reverse, instead of inviting reliance, as in *Brandriet,* the bank here encouraged the Buxcels to independently investigate.

[¶ 46.] These circumstances have arisen before. In *Klein,* 196 N.W.2d at 620–21, Virginia Klein sued her bank when it foreclosed on stock she pledged as collateral for a loan the bank made to her employer. Her employer already owed the bank $9,250, and the bank intended to rely entirely on Virginia's stock to secure both loans. *Id.* at 621. Virginia was unaware of this and the bank never disclosed it to her. *Id.* at 621–22. She alleged that the bank's failure to inform her of all the details of the transactions was fraudulent. *Id.* at 622. She had been a customer for two decades, and she trusted the bank just as she would her doctor or lawyer. *Id.* The Minnesota Supreme Court held that although a bank is generally under no fiduciary duty to a borrower, special circumstances may exist requiring the bank to disclose certain material facts:

> We believe the correct rule to be that when a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction ... unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.

*Id.* at 623. The Court found no "special circumstances" to justify imposing a fiduciary duty on the bank, as no evidence in the record suggested that the bank knew or should have known that the plaintiff was placing her trust and confidence in it. *Id.*

[¶ 47.] The Minnesota Supreme Court was again called on to decide when a borrower might validly claim a fiduciary relationship with a lender in *Stenberg v. Northwestern National Bank of Rochester,* 307 Minn. 487, 238 N.W.2d 218 (1976). Mr. and Mrs. Stenberg wished to finance an expansion of their small business. *Id.* at 219. They opened a line of credit with Northwestern Bank. *Id.* When their debt increased, the bank encouraged them to obtain a loan from the SBA to consolidate the debt and reduce interest charges. *Id.* The bank assured the Stenbergs their relationship with the bank would help their business grow and they should not worry about their increasing indebtedness. *Id.* Against the warnings of their accountant, they took the bank's advice. *Id.* Their business failed and they went bankrupt. *Id.*

[¶ 48.] Claiming they relied on the bank's counseling, the Stenbergs sued alleging a fiduciary obligation. *Id.* In rejecting this assertion, the Court ruled that the evidence would not support a "basis for plaintiffs' claim that a fiduciary relationship existed...." *Id.* Mr. Stenberg was a businessperson, "capable of independent judgment"; thus, no basis existed for an exception to the general rule that a bank owes no special duty to its borrowers. *Id.* (citing *Klein,* 196 N.W.2d at 623). As they were able to make their own decisions, the Court found they could not justifiably rely on the bank's representations. *Id.*

[¶ 49.] One case the *Garrett* Court relied on for guidance was *Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235 (1982). Indeed, we quoted its definition of a fiduciary relationship. In *Denison,* the Kansas Supreme Court held that in a creditor-debtor relationship, persons cannot "abandon all caution and responsibility" for their "own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held as a fiduciary." *Id.* at 1243–44.

[¶ 50.] All these decisions recognize that to create a fiduciary obligation a customer must justifiably place trust and confidence in the bank, and the bank must also knowingly accept such trust. Here, First Fidelity encouraged the Buxcels to seek outside advice and to examine the books. Not

having accepted the Buxcel's purported reliance, the bank owed no fiduciary duty to them, and the circuit court was correct when it directed a verdict against them on this issue. Finding a new fiduciary duty here may be a grand gesture to aid those who borrow money and later fail in business, but this holding is unsound. Not only will it beget less customer service and more reluctance in giving advice, but also it will inevitably bring a chorus of disappointed entrepreneurs desperate for the courts to rescue them by transforming their lenders into insurers.

[¶ 51.] GILBERTSON, Justice, joins this dissent.